**BOARD OF PUBLIC BUILDINGS, State of Missouri, Plaintiff-Appellant,**

v.

**The GMT CORPORATION et al., Defendants-Respondents. (Exceptions of De-Ge, Inc., et al.)**

No. 38496.

Missouri Court of Appeals, Eastern District.

Feb. 21, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 13, 1979.

---

her remarks. The defendant requested no other relief.

522

Donald U. Beimdiek, St. Louis, for plaintiff-appellant.

Millar, Schaefer & Ebling, Samuel C. Ebling, Gregory F. Hoffmann, Doskocil, Pulos & Feld, Constantine G. Pulos, St. Louis, for defendants-respondents.

PER CURIAM.

The condemnor, Board of Public Buildings, a body corporate and politic, created by § 8.010 RSMo.1969, and empowered to acquire by eminent domain real property necessary, useful, or convenient for the use of the Board in the exercise of its statutory authority, brings this appeal from a judgment entered upon a jury verdict in an amount of $300,000.00 as damages for the taking of property located at 702–706 Pine Street in the City of St. Louis, owned by the respondents, De-Ge, Inc., a corporation, Gregory Degerinis, Betty D. Velten and Theodora Degerinis Sampel. We affirm.

The property taken by the condemnor was improved by a four-story building in which three businesses were operated. The title owner is De-Ge, Inc., a family owned corporation. The stockholders in the corporation are Mrs. Panagiotta Degerinis and her three children, Betty Velten, Gregory Degerinis and Theodora Sampel. Theodora Sampel and her husband, John Sampel, operated the Upstream Lounge on the first floor of the building. Betty Velten and Gregory Degerinis rented a portion of the building—a part of the first floor, where a hotel lobby was located, and the second, third and fourth floors—from the corporate owner and then subleased the rented premises to a manager who operated the Oriole Hotel therein. The remaining part of the first floor of the building was leased by the corporate owner to one Robert Risha who operated Risha's Beauty Salon in that portion of the building.

On appeal the appellant relies on three points as grounds for a new trial, and each is directed to alleged errors of the trial court in the admission of evidence on the question of market value of the property taken, or with respect to cross-examination of expert witnesses who testified for the appellant on the question of market value of the property taken. We conclude that one of these points was not properly preserved for review, and that the other points involve questions wherein the trial court is

clothed with a broad discretion and in neither did the court abuse its discretion. We affirm.

Appellant's first Point Relied On is that the trial court erred in permitting the owners of the property appropriated to introduce evidence of prices paid by the Planters Redevelopment Corporation (hereinafter "Planters") for properties it acquired for construction of the Boatman's Tower building in downtown St. Louis. Appellant contends this evidence was inadmissible because it involved sales of three parcels of property to a condemnor and not purchase prices paid by a willing buyer to a willing seller.

■ Whether the trial court erred in admitting evidence in condemnation proceedings concerning market value must be reviewed in light of the circumstances existing at the time the ruling was made. Where it becomes clear that, in light of subsequent evidence, evidence previously admitted was deprived of all evidentiary value, it becomes the duty of the party whose objection to the previously admitted evidence was overruled to call the trial court's attention to the matter and move to strike the earlier testimony on the ground that it was, by reason of said subsequent evidence, incompetent and inadmissible. The failure of the party litigant to do so constitutes a waiver of the objection and does not preserve the point for review. *State ex rel. State Highway Commission v. Ogle*, 402 S.W.2d 605, 611[4, 6] (Mo.App. 1966); *State ex rel. State Highway Commission v. Heim*, 483 S.W.2d 410, 414[10, 14] (Mo.App.1972); *State ex rel. State Highway Commission v. Henderson*, 381 S.W.2d 10, 12[5] (Mo.App.1964).

The evidence complained of under this Point was testimony concerning the sale of three parcels of land[1] to Planters, a corporation formed by the Boatman's National Bank of St. Louis (hereinafter "Boatman's") under the Missouri Urban Redevelopment Corporation Law, Ch. 355, RSMo.

1969, and clothed with the power of eminent domain, for the purpose of acquiring land upon which to construct the Boatman's Tower building.

In the property owner's case Garland Noonan, a real estate appraiser, testified concerning comparable sales. The appellant's trial counsel interposed an objection to any testimony about the sale of the Apex Engraving Company property to Planters "because of the fact the Redevelopment Corporation had the power of condemnation, and therefore would not fit the court's definition of a willing buyer and a willing seller." The objection was overruled and Mr. Noonan was permitted to testify that the Apex property was sold to Planters in February, 1974, for $42.05 per square foot.

A similar objection was made and overruled to Mr. Noonan's testimony concerning the purchase price paid by Planters for the two other parcels, i. e. the Gutweiler property in April, 1974, for $51.95 per square foot, and the Gark-Ruprecht-St. Louis Union Trust Company property in February, 1974, for $41.07 per square foot.

When these objections were made, there was nothing in the record, save the statement of appellant's trial counsel, showing that Planters had the power of condemnation to cast doubt upon the admissibility of this evidence; there was, at this time, no evidence that any of these parcels were acquired after a condemnation proceeding had been instituted or that the sales were completed under the threat of condemnation.

■ The rule in Missouri, as we read the case law, is that the party seeking to introduce into evidence comparable sales as tending to establish the value of the property at the time of the taking has the burden of showing that the sale was voluntary; however, this burden is discharged prima facie by the aid of a presumption that the price of land sold was in fact fixed freely and not under compulsion, and the burden

---

1. These three parcels are: 1) Apex Engraving Company property at 110–112 N. Broadway; 2) Olive M. Gutweiler property at 114–118 N. Broadway; and, 3) Gark-Ruprecht-St. Louis Union Trust Co. property at 414 Pine St.

of coming forward with evidence showing that a particular sale was not voluntary shifts to the opposite party. *State ex rel. State Highway Commission v. Dockery*, 340 S.W.2d 689, 693–4 (Mo.1960).

▉ While there is a split of authority on the question whether a sale to a purchaser with the power of eminent domain is compulsory because of the existence of that power alone, 5 Nichols, Eminent Domain § 21.33, at 21–94, rev. 3d ed., 1975, and evidence of said sale is not admissible as a comparable sale for the purpose of proving fair market value, we are of the opinion that in Missouri this is not the rule except where it is shown in the offeror's own evidence that the sales were made subsequent to the institution of condemnation proceedings to appropriate the property, or where there is evidence from which a trial judge reasonably should have concluded that the sale involved was not voluntary, or where the party opposing the admission of the evidence comes forward with evidence that the sale was other than voluntary. While appellant's trial counsel made an objection on the grounds that Planters had the power of condemnation, that alone furnished no evidence of this fact, nor was it any evidence that the power of eminent domain was being exercised at the time of the sale of the properties in question. Counsel did not request leave to offer any evidence to overcome the presumption and thereby demonstrate to the trial court that his objection on those grounds was well taken.

▉ In *State of Missouri ex rel. State Highway Commission v. Bruening*, 326 S.W.2d 305, 314[10] (Mo.1959) it was held that the mere fact that the City of Kansas City was invested with the power of eminent domain did not, of itself, show that the sales were compulsory rather than fair transactions and did not require that the exclusionary rule be applied. The exclusionary rule becomes applicable when the evidence demonstrates that the condemning authority has a fixed purpose to institute condemnation proceedings if it cannot acquire the land by purchase at a satisfactory price, or that the condemnor threatened the seller with condemnation if a satisfactory purchase price was not agreed upon. In the absence of any evidence on this question at the time the objection was made we believe the trial court cannot be convicted of error in admitting the evidence. *State ex rel. State Highway Commission v. Dockery*, supra.

Furthermore, we also conclude that, as in the *Dockery* case, the defendant's witness's testimony in this respect was for the purpose of showing what comparable sales Mr. Noonan took into consideration in arriving at his opinion of the value of the defendant's property, not as independent evidence of the fair market value of the said property. This is another reason why we do not believe its admission to be prejudicially erroneous.

▉ In the appellant's case it was developed during the testimony of one of its experts, Mr. Clarence M. Turley, Jr., the executive Vice-President of Turley-Martin Company, and one of the brokers who handled the acquisition of the property for the Boatman's Tower site, that to the best of his recollection a condemnation suit had already been filed when the Gutweiler property was acquired. He further testified that the Gutweiler parcel was the last one acquired for the Boatman's Tower site; and that prior to the acquisition of the Gutweiler parcel he valued it at $40.00 per square foot, "or less;" but that his company was instructed to complete the purchase at $51.00 per square foot because time was of the essence and Planters wanted to complete the purchase.

This was the first time, in the appellant's case, that any evidence was developed indicating that the sales to Planters were less than voluntary. However, appellant's trial counsel did not, at that point, call to the attention of the trial court the continuing nature of his objection nor did he move the trial court to strike this evidence. Appellant thereby waived any error, if error it was, in the admission of this evidence and preserved nothing for appellate review. *State ex rel. State Highway Commission v. Ogle*, supra; *State ex rel. State Highway Commission v. Henderson*, supra.

Appellant next contends that the trial court erred in admitting evidence of the gross business income and profits of the Oriole Hotel and in permitting the owner's experts to capitalize those business profits as a basis for their valuation of the property. It argues that this evidence should not have been admitted because the hotel, although owned by the corporate defendant, was leased to Betty Velten and Gregory Degerinis, none of the revenue generated by the operation of the hotel was paid to the owner, and therefore this revenue could not be included in the computation of the fair market value of the condemned property.

■ Capitalization of rental income derived from condemned property is a method employed for the purposes of ascertaining fair market value when all of the property is taken by the condemnor. *Land Clearance for Redevelopment Authority of City of St. Louis v. Morrison*, 457 S.W.2d 185, 192[2] (Mo. banc 1970). Not only did the respondent's experts employ this method in evaluating the fair market value of the property, but the appellant's experts also employed this method in arriving at their opinion of its fair market value. One of the appellant's witnesses, Mr. Turley, testified that in his opinion this property would only be sold on the income approach.

■ We believe that it is clear that the general rule in Missouri is that evidence of profits derived from a business conducted on property is too speculative, uncertain and remote to be considered as a basis for computing or ascertaining the market value of the property taken in condemnation proceedings. *Shelby County R–IV School District v. Herman*, 392 S.W.2d 609, 613[8] (Mo. 1965); *St. Louis Housing Authority v. Bainter*, 297 S.W.2d 529, 534[6] (Mo.1954); 27 Am.Jur.2d Eminent Domain, § 431 (1966); 4 Nichols, Law of Eminent Domain, § 13.3[1] (rev. 3rd ed. 1975).

However, where the owner of real estate chooses to rent it, rather than to use it himself, he derives what may broadly be called profits from a business. But these profits are of a peculiar nature, and the business is a renting business rather than a manufacturing or mercantile business, and, according to one text writer, it is the peculiar nature of this income, and the special problems of valuation to which it gives rise which have led most courts, not only to subject it to special treatment in the law of evidence, but also to deny it the name "profits." 1 Orgel, On Valuation Under Eminent Domain, p. 697.

According to this same text-writer, the latter fact is of little importance in itself, but it is the special treatment in the law of evidence given the profits of a rental business which is of significance; and, when the renting of the property constitutes its best available use, or at least a plausible use, the realized or estimated rentals are a useful guide to the appraiser in valuing real estate.

He also mentions in a footnote relative to his statement about the income from a rental business and its special significance, that the distinction between what is generally considered profit in the income from a business and "profit" from rents received by the conduct of a rental business cannot always be clearly drawn. As an example he cites a hotel business, which is essentially a business of renting rooms by a series of very short lease and says, l. c. 697, fn. 2:

"Yet the courts might properly regard a hotel business as a 'profit producer' rather than as a mere 'rent producer,' whereas they regard an apartment house or rented office building as a rent producer."

In the chapter immediately preceding the chapter in which this text writer made the observation aforesaid, and wherein he was treating with the admission and treatment of the realized or prospective income of a business as evidence of the value of the condemned premises on which the business has been or may be located, he discussed those cases where income derived from business profits may be an acceptable measure of market value. In this context he said, Orgel, idem, Vol. 1 § 157, p. 648:

"If the real estate that is being valued were coterminous with the entire enterprise from which the income is derived, a capitalization of this income would be not merely a relevant datum for the valuation of the property but might be the best possible measure of its value. This situation would arise in those cases where the sale of the real estate will necessarily put the buyer in possession of all those assets and attributes which go to make up the business enterprise."

The author states that it is probable that no case can be found which precisely meets this condition, but also points out that in the case of a run-down, badly located hotel, the cost of reproducing the obsolete and depreciated building would be so literally irrelevant that an appraiser would be wasting his time attempting to estimate it. He suggests that the capitalized earning power of the enterprise using the properties, or which might use them, might be the "one significant basis of valuation," after appropriate deductions are made from the capitalized value of the enterprise. Where the building was not better adapted for some enterprise other than the one being operated in the building at the time of the taking, the value of that enterprise would fix the upper limit of the value of the property.

We believe it is clear that where the acquisition of property by a condemnor includes a hotel, unusual considerations enter into the method of valuation to be employed in determining its fair market value. We have found no Missouri case deciding the specific question presented in the factual context of this case, and the litigants have cited none to aid us.

■ In disposing of this point, the initial question to be determined is whether the revenue developed in the operation of the Oriole Hotel must be characterized as rental income or business profit.

Defendant's evidence was that the record owner of the condemned property at the time of the taking was De-Ge, Inc. Betty Velten was the president of the corporation, Gregory Degerinis was vice-president, and Theodora Sampel, secretary-treasurer. The corporation had been incorporated sometime in 1966, approximately two years after the death of the father and head of the family, and title to the subject property was deeded to it sometime in 1967.

At the time of Mr. Degerinis' death this property was left to Panagiotta Degerinis, his widow, and their children, Betty Velten, Gregory Degerinis and Theodora Sampel. During Mr. Degerinis' lifetime he operated the Oriole Hotel in the building on the land taken by condemnation. After his death, Mrs. Velten and Gregory Degerinis took over the operation of the hotel and continued operating it as a "family business" until after the corporation was formed in 1966. The shareholders of the corporation were the owners of the building, i. e. the surviving members of the Degerinis family, and it was they who deeded their interest in the property to the corporation. However, the operation of the hotel continued as it had prior to the transfer of the land and the improvements thereon to the corporation. Sometime in 1970 the members of the family operating the Oriole Hotel entered into an oral agreement with Richard Hughes to "operate" the hotel for himself. According to the agreement Mr. Hughes paid Mrs. Velten and Gregory Degerinis $4.75 per day as rent for each room occupied by transient guests and anywhere from $40.00 to $60.00 per month (the differential was determined by the furnishings of the room and whether it had its own bath) for each permanent guest of the hotel. Generally, there were about 20 permanent guests in the hotel. This arrangement continued until the time the property was appropriated by the appellant in 1974.

Mr. Hughes paid the sums which were the subject of this agreement into an account at the First National Bank in the name of the Oriole Hotel, and both Mrs. Velten and Gregory Degerinis could write checks on the account. Expenses in connection with the operation of the hotel were paid out of this account. None of the money left in this account was ever paid to the corporation. Whatever was left, was paid over to Theodora Sampel and eventually

distributed proportionately to the four members of the family, who were the only shareholders of the corporation which held title to the building in which the Oriole Hotel was being operated.

The corporation was never paid rent for the use of the premises by the hotel by either Mrs. Velten or Gregory Degerinis during the entire period they operated the hotel between 1967 and 1970, when Mr. Hughes took over its management and operation.

The evidence to which this grounds for reversal is directed came in during Mrs. Velten's testimony, when the landowners' trial counsel asked how much income had "come" from the Oriole Hotel from Mr. Hughes at the end of 1974 before the property was taken. Trial counsel for the appellant voiced his objection in the following manner:

"I object to that, Your Honor, unless it is established that this is income from rent to the owners of the property."

The thrust of this objection, as it developed, was that unless it was shown that the owner of the property, the corporation, was the recipient of the income for the use of that part of the building in which the hotel was operated, any monies received by the people who were renting the hotel from the owner was business income earned from the operation of the hotel and the appellant was taking only the real estate and not the business operated on the property.

In support of its contention that the owner of the property never received any rentals from the hotel operation, appellant's trial counsel, at the bench and out of the hearing of the jury, argued that answers to interrogatories directed to the corporate defendant included income tax returns of the corporation which did not include any income from the hotel operation.

The objection was overruled and Mrs. Velten was permitted to testify that she and her brother received a gross amount of $33,931.00 from Mr. Hughes for the rental of hotel rooms in 1974. Out of this amount she paid insurance, accounting, advertising, maintenance and repairs, office supplies, laundry, hotel supplies, inspection and license fees, sewer and water, electricity, telephone and salaries. What remained went to Mrs. Sampel and was then divided proportionately among the four family members and shareholders in the corporation. During cross-examination Mrs. Velten testified that the 1973 corporate income tax return reported that the gross rents received by the corporation were $28,083.00, but no money received from the hotel rentals was included in this figure. Also, during cross-examination she testified that she and her brother never paid any money to the corporation as rent for the hotel.

With this evidence in the case, the landowners' expert witnesses, Mr. Noonan, P. C. Robinson and Frank Miller, were permitted, over objection, to take into account the monies deposited into the hotel bank account by Mr. Hughes in 1974, in arriving at their estimates of fair market value of the property by means of the income method. The objection to the testimony of Messrs. Noonan and Robinson was that these monies were not income to the property owner, but were income from the operation of the business. Later, during cross-examination of Mr. Noonan, a motion to strike his testimony about valuation by the income approach, because it included rents for furnished rooms, was made and denied. The objection to the testimony of Mr. Miller was that the hotel rent, according to this witness' testimony, was the net operating income and not rental income from the space occupied by the hotel. Mr. Miller explained that when he used the word "operating income" he was not referring to the operator of the hotel, who was working on an override, but he was referring to income realized by ownership.

We conclude that the $33,900.00 received by Mrs. Velten and Gregory Degerinis from Mr. Hughes was rental income and not business profit in the sense appellant argues. The reason behind the rule excluding profits from a business conducted upon the property by the property owner himself is that said profits depend so much on the capital employed and the fortune, skill and

good management with which the business is run, and therefore, it furnishes no test of the value of the property. The crucial question then is whether this income was produced by the use of the property or by the skill and labors of the landowners.

It is clear, we believe, that the income capitalized by the owner's expert witnesses in this case as rental income was, insofar as the landowners are concerned, income earned from the use of the hotel property by Mr. Hughes; there is no evidence that they employed any skill or labor in the operation of the hotel after Mr. Hughes took over the operation of the hotel business.

While the evidence on this question is somewhat confusing,[2] we believe an overview of the evidence resolves some of the conflicts in the defendants' evidence and supports our conclusion that the monies paid into the Oriole Hotel bank account by Mr. Hughes were rental income.

Although Mrs. Velten testified that she and her brother leased the hotel from the corporation, no lease was introduced into evidence and there is no evidence that any rents were paid to the corporation by them pursuant to the lease. However, six years prior to trial, the hotel was subleased to Richard Hughes, whom Mrs. Velten characterized as a "manager" or "operator." Mr. Hughes was operating the hotel at the time of the taking and depositing the rents into the hotel bank account. There is no evidence in the record that after Mr. Hughes took over the operation of the hotel either Mrs. Velten or Gregory Degerinis participated in the operation or management of the hotel business.

The corporation was incorporated for the purpose of taking title to the subject property and the family members deeded their interest in the property to the corporation. According to the 1973 corporate tax return depreciation schedules the property at 702–704–706 Pine Street reported the cost of acquisition as $26,514.00. Mrs. Velten testi-

fied that insofar as she knew no money actually changed hands in the transaction, and this evidence stands uncontradicted. At the time of the taking two other businesses were being operated in the building on the property. One, the Upstream Lounge, was operated by John and Theodora Sampel. Mrs. Sampel was Secretary-Treasurer of the corporation. The Sampels paid the corporation a monthly rental of $500.00. The other, Risha's Beauty Salon, operated by Robert Risha, paid $700.00 per month rental to the corporation. All of the value experts agreed that that part of the building occupied by the hotel was being employed in its highest and best use.

The corporation's business was not confined to the ownership of subject property; it also held title to seven other "family owned" properties, some being flats and the others apartments, and received rental income from these. One thing that is clear, the family treated these properties, including the subject property, as "family owned property" and shared equally in income derived therefrom. The business of the corporation was a "renting business" and its profits were of a peculiar nature so that most courts would deny them the name of "profits" and subject them to special treatment in the law of evidence. Orgel, Vol. 1 idem, p. 697 (2nd ed. 1953). The "special treatment," as we view it, is the admissibility of the rental income for valuation purposes in condemnation cases. 4 Nichols on Eminent Domain, § 12.3122 (rev. 3rd ed. 1975); *State ex rel. State Highway Commission v. Ellis*, 382 S.W.2d 225, 234[15] (Mo.App.1964).

■ There are also other circumstances which make this evidence admissible for purposes of valuation in this case. We have here a hotel classified by the landowners' experts as "low class," one of eight in existence in the St. Louis area at the time of the taking. According to Mr. Noonan's testimony, the income method of computing fair market value was the most appropriate

---

**2.** The confusion arises primarily from conflicts between the testimony of Mrs. Velten and answers to interrogatories filed by the corporate defendant relative to rents received by the corporation in 1973.

method inasmuch as the likelihood of reconstruction is nil, because of the age of the building—approximately 75 years at the time of the taking. A sudden increase in rental income between 1974 and 1975 was attributed to the fact that a number of hotels which had competed with the Oriole Hotel for business had been razed prior to 1974 in connection with downtown redevelopment projects and as a result the demand for rooms in the Oriole Hotel had increased markedly. Nevertheless, the cost of reproducing the building as an approach to valuation was, at best, questionable, and therefore, Mr. Noonan opined, the capitalized earning power of the building was the most significant basis for its valuation, and the best method for determining what a willing buyer would most heavily rely on in considering what he would pay to purchase the property.

Furthermore, the income paid by Mr. Hughes from the operation of the hotel was only one of three incomes realized from the rentals derived from the building in using this method of valuation. The rents from the beauty shop were also used; and, because the lounge was rented by the Sampels and any rent paid for the lounge might therefore be suspect, the same rental per square foot being paid for the beauty shop was applied also to the area occupied by the lounge in arriving at the fair rental value to be used in the income approach for valuation of the building. These three rental incomes totalled $48,793.00, from which expenses of $13,577.00 were subtracted, leaving a net income of $35,396.00 realized from rents. Mr. Noonan, nevertheless, used a net income of $31,396.00 in computing the net income "in case I missed anything." He then assessed 75% of this to the land and 25% to the building. He valued the land at $254,562.00 and the building at $49,056.00, and testified that the fair market value of the property at the time of the taking was $303,618.00 by the income method. By the reproduction less depreciation method, Mr. Noonan valued the property at $303,940.00.

Mr. Robinson, another expert, using the income method valued the property at $278,800.00; from the cost approach, he valued it at $289,900.00. He felt the fair market value at the time of the taking was $278,800.00 because this type of property would be purchased by the type of investor who was looking for income and therefore the income approach better reflected the fair market value of the property at the time of the taking.

Mr. Miller, a third expert on valuation, also testified to the fair market value of the property as of the date of the taking. In arriving at his opinion he employed three methods: the market approach, replacement or cost approach, and the income approach. He opined that because there were fewer buildings of "the low-class style hotel" in existence, comparable sales would be hard to find and that the first approach would be to establish land value through market sales, and then extract whatever portion of income that represented "in the net operating stream towards a building improvement" in order to capitalize, and his cost approach would substantiate his value by the income approach. He testified that the fair market value by the income approach was $258,500.00; by the cost approach, $268,700.00.[3]

Appellant's reliance on *State ex rel. State Highway Commission v. Flynn,* 263 S.W.2d 854 (Mo.App.1954) is, we conclude, not well founded. In *Flynn* it was held that in a proceeding to condemn for public use land and a tenement building thereon, evidence of the capitalization or rental income from furnished apartments was properly excluded because it would reflect the market value of the real estate plus personal property where the personal property was not taken. Appellant relies on *Flynn* to argue that the capitalization of income from the hotel would reflect the market value of the real estate plus the hotel furnishings when the furnishings were not taken, and therefore it was prejudicial error to admit this evidence.

**3.** The defendant-respondents' experts computed their opinion of fair market value on the income approach by employing the 1974 rental figure of approximately $33,000.00 as the rents paid to the defendants by Mr. Hughes in 1974 and capitalized this amount.

We believe the cases can be distinguished. The condemned property in *Flynn* was a brick tenement building consisting of a series of attached buildings joined by common walls and rented as fourteen separate apartments. The evidence was, however, that the building was adaptable for use as seven separate residences or units, and, if so adapted and used, the market value of the property would be increased.

Although not the basis for the court's decision, it is clear in *Flynn,* that the use of the property there was not its highest and best use; and, had it been adapted and used in its highest and best use as seven separate units the furnishings would have added nothing to the fair market value of the property and any rents attributable to said furnishings were inadmissable.

There is no question whether that portion of the condemned property which was being used as a hotel in this case was being used in its highest and best use. The evidence is that it was.

By the very nature of the hotel business it is essential that the rooms used in the operation of a hotel contain furnishings suitable to the conduct of the business.

From a comparison of the experts' testimony in this case it appears that in computing the fair market value of hotel property taken by condemnation by the income method, one of the decisions which the expert witness must make is whether to estimate the value of the hotel furnishings and allocate the value thereof against rents paid the owner for the operation of the hotel. The expert must rely on his professional judgment in making this decision. The testimony of the witnesses for both parties in this case supports this conclusion. Plaintiff-appellant's expert Hartnett testified that evaluation of hotel property "typically" includes the furnishings, although in some cases the hotel may be sold without the furniture. He stated that "(g)enerally, the furniture is included with this type of hotel" and when asked if his calculations were based on income derived from the hotel operation, and whether a hotel operation includes furnished rooms, he answered

both questions affirmatively. Plaintiff's expert witness Turley testified that his appraisal did not take into consideration the furniture in the rooms, and when asked whether hotels customarily are sold with or without furnishings, replied, "I really don't know." Defendant's expert witnesses testified that their income figures were based on rental income from furnished rooms. Defendant's experts relied on the figure for gross income from hotel rents provided by defendant's accountant, and projected that figure over a twelve-month period. Their totals were $33,396.00, $33,931.00 and $33,-900.00, respectively. Plaintiff's witness Turley arrived at a gross income figure for the hotel rents of $7320.00 which was an estimated fair rental value of $122.00 per year for each of 60 rooms. Plaintiff's expert Hartnett also estimated the fair rental value of the hotel rooms, but he used a more complex method than Turley's; he used the actual rent paid by the permanent residents, and an estimated average daily rate for transients, and after a 30% vacancy allowance, he found the total gross income from room rentals to be $53,585.00.

Inasmuch as many elements properly enter into a determination of the market value of real estate, this inquiry may properly be allowed to take a wide scope and the landowner is entitled to have the jury informed as to all facts relating to the condemned property which would naturally impress a person of ordinary prudence in negotiating for its purchase. The admissibility of evidence in a condemnation case depends upon whether it tends to help the jury in arriving at the issue of value and damages. *Missouri State Park Board v. McDaniel,* 473 S.W.2d 774, 779 (Mo.App. 1971).

The wide range of values established by the experts from both sides suggests that a single proper method of valuation of this property cannot be prescribed. Rather, it is a matter which lies within the area of the witness' expertise as to both the initial question of whether the furnishings are to be included in the valuation, and the subsequent determination of the appropri-

ate method of measuring the income generated by the room rentals. Where four of five experts testifying as they did here, conclude that rental income from furnished rooms fairly reflects one aspect of this property's fair market value, this court is not compelled to declare that evidence irrelevant by reason of the statement in *Flynn,* supra, that these furnishings were not "taken."

In view of the peculiar circumstances present in this case we conclude that in the absence of any showing that the value of the furniture in the hotel added significantly to the rentals paid by Mr. Hughes, the holding in *Flynn* has no application to this case.

As we have previously observed, the Oriole Hotel was a "low class" hotel in a seventy-five year old building and furnished unlike any modern hotel or motel. Photographs of three of the rooms introduced into evidence by the appellant show that the rooms were scantily furnished with a metal frame bed, mattress and pillow. One had a metal chair in the room. On the other hand, three color photographs introduced into evidence by the respondents and identified as three rooms in the hotel, show well-furnished rooms with a bed in each, a chair in two of the rooms, a table in each, and a chest of drawers in one. There was no evidence adduced by either of the parties concerning the value of the furnishings in the rooms. The absence of any evidence of the reasonable value of these furnishings on the part of the respondents may be attributable to the fact that it has been their contention, initially set out in their Answer, that the furniture was "trade fixtures" being taken by the condemnor.[4]

Unlike a manufacturing or mercantile business, there was no likelihood that this hotel could find a location suitable to its continued operation, and even if it could, the cost of removal of the furniture in the rooms displayed in the appellant's photographs would most likely exceed the fair market value of these furnishings. No expert who testified in the case affixed any

value to the furnishings, and most agreed that the room charges received by Mr. Hughes were not out of line for similar hotels in the area.

We conclude that in evaluating the rental income received by the respondents from Mr. Hughes to arrive at the fair market value of the property taken, the fact that the income came from the rental of furnished hotel rooms did not make the evidence inadmissible under the facts of this case where the property was employed in its highest and best use.

The admission of this evidence of fair market value arrived at by the use of the capitalization of rental income was not error in view of the totality of the evidence in this record.

Appellant's final Point is directed to alleged errors in respect to cross-examination of its expert witnesses about (1) their fees and commissions in connection with properties unrelated to this case, and (2) about non-comparable properties and the "average" value range of general areas of unidentified properties without establishing that such properties were comparable to the property appropriated in this case.

■■ We find no prejudice in the cross-examination of the appellant's expert witnesses in either respect. The courts of Missouri have long followed the rule that the scope and extent of cross-examination of a witness in a civil case is discretionary with the trial court, and wide latitude is to be allowed. Any pertinent inquiry having some reasonable bearing on the issues in the case, or tending to impeach or discredit the witness is generally proper on cross-examination. *Harris v. Quality Dairy Company,* 423 S.W.2d 8, 12[6], (Mo.App.1967).

■ Appellant's complaint is that respondent's counsel interrogated its two expert witnesses about appraisal fees they received for their appraisal of the seven parcels involved in the entire block taken for the Wainwright Project and that Mr. Turley was required to state the exact per-

---

4. Because of the result we reach we do not find it necessary to reach this issue.

centage of the commissions received by his firm for the sale of eight comparable properties.

We believe inquiries concerning the fees the appraisers received in the acquisition of the Wainwright Project, one parcel of which was subject property, was proper cross-examination for the purpose of showing any interest these witnesses might have in the case on trial.

With respect to commissions received by Mr. Turley's firm for the sale of comparable properties, we have studied the pages of the transcript to ascertain the content of the cross-examination of which the appellant complains.

This matter came about during the course of cross-examination of Mr. Turley concerning sales he took into account in arriving at his opinion of the fair market value of the subject property, and particularly with respect to those sales with which he had personally been involved and which were comparable to this property. As stated by respondent's counsel in response to an objection by appellant's counsel, the purpose of this line of inquiry was to test Mr. Turley's qualifications as an expert appraiser, i. e. the sales he had handled.

However, Mr. Turley then proceeded to testify concerning commissions he had received from the sale of certain properties in the downtown area over an objection that these commissions were not material to the value of the property sold or of the property in question. According to respondent's counsel, this evidence was being offered as going to the credibility of the witness, not to prove value.

To properly apprise one of the legitimacy of this line of inquiry it is necessary to read further in the transcript, for it is then apparent that respondent's counsel was laying a foundation to demonstrate that Mr. Turley's opinion of value of the subject property may have been influenced by other sales handled by Mr. Turley but not included in his appraisal report to appellant.

██ We agree, nevertheless, that the commission received on the sales of these properties is immaterial even for the purpose aforesaid except where a commission was based upon a percentage of the sales price and might thereby afford a basis from which to compute the sales price if otherwise unavailable. We do not understand that to be the case.

██ However, even if this be error, appellant has not demonstrated how it was prejudiced by this evidence, and we do not find that it was.

██ Appellant's final contention is that cross-examination of its experts concerning non-comparable properties and about the "average" value range of general areas of unidentified properties without establishing their comparability is likewise without merit. The only portion of the transcript referred to in the argument directs us to the testimony of Mr. Turley, and therefore we limit our discussion to what took place there.

Mr. Turley, over objection, was required to respond to inquiries concerning (1) the average price and price range for sales of property acquired for the construction of the Mercantile Center and (2) unidentified properties acquired for the Mercantile Center. He did so, however, under cross-examination directed to ascertain whether this information was contained between pages 6 and 9 of his appraisal report to appellant as information he considered in reaching his conclusion as to the fair market value of the subject property. At trial the appellant's objection was essentially that respondent's inquiry should be limited to specific parcels of property which were comparable. In his efforts to ascertain whether this expert witness considered other properties which were not comparable in arriving at his valuation, the respondent was entitled to a wide latitude of cross-examination, and we conclude from a reading of the transcript this is what was being pursued by this line of inquiry, and for that reason we find no error in permitting this cross-examination.

Affirmed.

All Judges concur.