**LAND CLEARANCE REDEVELOP-MENT AUTHORITY, Appellants,**

v.

**KANSAS UNIVERSITY AND, ENDOW-MENT ASSOCIATION, et al., Respondents,**

**Exceptions of Plaintiff and Defendants: Parking Systems, Inc., d/b/a Mutual Garage.**

**No. WD 42248.**

Missouri Court of Appeals, Western District.

July 31, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 2, 1990.

Application to Transfer Denied Nov. 20, 1990.

Lowell L. Smithson, Kansas City, for Land Clearance Redevelopment Authority.

Brian T. Meyers, Kansas City, for Kansas University Endowment Ass'n, et al. Parking Systems, Inc. d/b/a Mutual Garage.

Before TURNAGE, P.J., and LOWENSTEIN and GAITAN, JJ.

LOWENSTEIN, Judge.

Appellant Land Clearance for Redevelopment Authority of Kansas City, Missouri (LCRA) is a public body which condemned a downtown Kansas City parking facility, known as the Mutual Garage, leased to the respondent Parking Systems, Inc. (PSI) under a 99–year agreement. PSI had 40 years left on the lease and had purchased the landlord's interest in the award, so by stipulation PSI is to be considered the owner of the property in question. LCRA disputes the judgment on a verdict of $2,000,-000, principally on the basis of the admission into evidence of capitalization of income or profits where the jury already had before it evidence of comparable sales. PSI filed in the Supreme Court of Missouri a cross-appeal pertaining to the constitutionality of the condemnation interest statute which after transfer here was consolidated with this appeal. This court's later order postured the cases as two separate appeals. The PSI appeal number 42616, by a separate opinion, and handed down concurrently, is transferred to the Supreme Court.

The land in question covered is in the 1000 block of Wyandotte, on which a basement and four story garage was built in 1926. The land itself covered 15,620 square feet. A very small portion of the building housed a cafe and bar—the rest was utilized as valet parking, where the driver gave an attendant the car to park. The PSI garage had some 325 spaces. LCRA obtained the property to assemble with other parcels to build a publicly owned self-park structure of over 1100 spaces.

The trial court, over LCRA's objections, allowed expert evidence of PSI's future profits that could have been reasonably expected after the October 1985 date of taking over the next 40 years. These figures were projected on the basis of demand for downtown parking as well as PSI's income figures from fifteen of its prior years of operation of the Mutual Garage. The comparable sales included three pieces of property within three blocks of PSI's garage which sold within two years before the taking. Experts from both sides used these sales in their computations, but some of the PSI experts also relied on income figures and projections. LCRA's theory was the PSI garage was old and outmoded for the current self-park trend in the downtown area, plus many of the new office buildings provided their own parking.

PSI's evidence on the fair market value of the property included: $2,775,000 by Mr. Rubin, its president; $2,168,000, by witnesses Burns and Farout; $2,103,000 by witness Eaton, and $1,725,000 by witness Fern. LCRA's evidence was $1,000,000 by witness Flanagan and $950,000 by witnesses Nunnink and Slack. For the most part the PSI experts arrived at value figures based on capitalized future profits, the LCRA experts arrived at their figures using comparables based on sales of nearby parking lots. The Commissioners' award was $1,200,000.

The trial record and briefs are quite lengthly. The issues on appeal will be condensed and combined. The various motions of both parties complaining of the other's briefs are all denied.

### THE LCRA APPEAL

#### I.

The underlying issue in this case is whether expert evidence of capitalization which is clear, certain, easily calculable not remote and subject to minimal conjecture as to past and future profits is admissible in a condemnation action where there is ample evidence of comparable sales.

The term "fair market value," which is the sum the trier of fact must determine to

award the landowner, is defined as follows in MAI 16.02.

The phrase "fair market value" as used in this [these] instruction[s] means the price which the property in question would bring when offered for sale by one willing but not obliged to sell it, and when bought by one willing or desirous to purchase it but who is not compelled to do so.

In determining fair market value you should take into consideration all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future.

The ultimate question under this point is, does the language of this instruction, or the law of evidence negate the admission of clear and substantial evidence of future profits of the landowner to the fact-finder if there is evidence of comparable land sales? A chronological examination of Missouri cases is now in order.

★ In *St. Louis Housing Authority v. Bainter*, 297 S.W.2d 529 (Mo.1957), as in the case at bar, there was no contest on the issue of the condemned premises being put to the highest and best use. *Id.* at 533. The court stated at page 534 "it is incompetent to go into the profits of the business carried on the property," and our law only requires compensation for the property taken, and further stating evidence of profits of "a business conducted on property is too speculative, uncertain, and remote ... for computing ... market value ... in condemnation." *Id.* However, the court then approved admission of the landowner's evidence of gallonage of gasoline be pumped as a properly authenticated method for "... the jury on the issue of ... fair market value of the premises condemned...." "The jury was entitled to consider all of such evidence in determining the fair market value of the premises in question." *Id.* at 535. *See also State v. Ellis*, 382 S.W.2d 225 (Mo.App.1964).

★ The landowner in *Shelby County R–IV School District v. Herman*, 392 S.W.2d 609 (Mo.1965), appealed after having his testimony stricken as to fair market value based on capitalization of farm profits. The court noted evidence of profits from a commercial business on land taken is "ordinarily inadmissible as a basis upon which to ascertain market value ... because it is too speculative, remote and uncertain." *Id.* at 613, citing *St. Louis Housing Authority v. Bainter, supra.* The farmer had picked by far and away his best year and used it to value future profits. The landowner lost, the court stating capitalization of the income method must be based on a "foundation, which minimizes, so far as possible conjecture and uncertainty." The court concluded saying the validity of an opinion based on capitalization of income depends on selection of an income figure "which was relatively stable, average and representative—of which there is a reasonable probability of permanence or persistence in the future." *Id.* at 614.

★ *City of St. Louis v. Union Quarry & Construction Co.*, 394 S.W.2d 300 (Mo. 1965), involved the taking of an abandoned rock quarry being used as a private dump. There were no comparable sales of profitable partially filled holes in the vicinity. The landowner produced two experts who gave value figures based on capitalization of income over the life of the use as a dump. The condemnor's evidence was based on the square foot sales price of strips of adjoining property. The court recognized the case was unique and the highest and best use of the land was not as residential property, but as an urban landfill. People paid money to dump refuse and the profit was produced without the labor of the owner and those "profits derived from its use are the chief source of its value ..." The court recognized a general rule that "business profits are ordinarily not admissible evidence of the value of the land on which the business is located." *Id.* at 306.

The reason for that rule is business profits are "too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining the market value." *Id.* The court further said:

The general rule, however, must be given an exception *ex necessitate* in this case, where the business is inextricably related to and connected with the land where it is located, so that an appropriation of the land means an appropriation of the business; where the evidence of net profits apparently is clear, certain and easily calculable, based upon complete records; where past income figures are relatively stable, average and representative, and future projections are based upon reasonable probability of permanence or persistence in the future, so that conjecture is minimized as far as possible, and where the body fixing the damages would be "at a loss to make an intelligent valuation without primary reference to the earning power of the business." For other reasons the variables are reduced to a minimum in this case. The period during which the income stream will continue to flow is fairly predictable. Many factors of uncertainty present in other types of cases are absent here: yields, weather, markets, supply and demand, uncertain fluctuations of labor costs, etc.

*Id.* at 305, (citations and one footnote omitted). The opinion in another footnote said the evidence showed "[t]he ever decreasing space available practically insures a continuous and persistent demand for the service offered." The court went on to state the income from the dump was "comparable" to the recognized criteria of rental income bearing on market value as espoused in *Bainter, supra. Id.* at 307. The court reiterated that the capitalization of income "in proper cases" is allowed in determining fair market value in condemnation cases. *Id.*

★ *State ex rel. State Highway Commission v. Barron,* 400 S.W.2d 33 (Mo. 1966), stands for this proposition:

And the tendency is to admit any evidence which sheds light on the question, leaving it to the discretion of the trial court to keep it within bounds. Artificial rules of evidence which exclude from the jury matters which men consider in their everyday affairs hinder, rather than help, the arrival at a just result. *United*

*States v. 25,406 Acres of Land,* 4th Cir., 172 F.2d 990.

*See also State ex rel. Highway Commission v. Texaco, Inc.,* 502 S.W.2d 284, 288–89 (Mo.1973), where the court further held errors in the admission or exclusion of evidence in land damage cases "will not result in the reversal of verdicts unless there is a substantial or glaring injustice."

★ In *Private Property for Municipal Courts Facility v. Kordes,* 431 S.W.2d 124 (Mo.1968), the court addressed an appeal by the condemnor on a tract in downtown Kansas City used as a surface parking lot, where the condemnor at pages 124–25, asked the question:

"Are business profits derived from land used as a parking lot and operated by the owner of the land properly capitalized to determine fair market value, even though such land can be used for other purposes and in spite of comparable sales of land in the area?"

In *Kordes* the condemnor argued the business profits were too speculative to be proper evidence of value. *Id.* at 125. Both sides agreed the property was put to the highest and best use. *Id.* The *condemnor's* experts had first valued the property by "the income capitalization method," but had incorrectly used figures almost 50 percent less than the landowner's actual income. *Id.* Then just before trial, "they reappraised the property using the market data approach of comparable sales" at trial. *Id.* The cross-examination was "devastating," and the city claimed the comparable sales evidence was "ignored," but as the court noted, the *weight* given this evidence was not known. The *owner's* experts "all said that the market data approach of comparable sales could not be used because the only sales were 'in the urban renewal development' and were not arm's length transactions." *Id.* at 125. Judge Barrett writing for the court concluded:

There was and is no question now that the owner's evidence of profits were clear, there was reasonable permanence of income and most important the use of the lot, its operation as a public parking lot was related to and connected with the

land so that appropriation of the entire tract (compare *Shelby County R–IV School Dist. v. Herman,* Mo. 392 S.W.2d 609, 614) appropriated the business and thus without quoting and demonstrating in detail the evidence and landowner's cause falls within and is governed by *City of St. Louis v. Union Quarry & Construction Co.,* Mo. 394 S.W.2d 300. And in this view, of course, the court did not err in admitting the evidence and refusing the city's withdrawal instruction and accordingly the judgment is affirmed.

431 S.W.2d at 126.

★ In a factual scenario akin to *Union Quarry, supra, State ex rel. State Highway Commission v. Mount Moriah,* 434 S.W.2d 470 (Mo.1968), involved a unique property that was not being bought and sold on an open market—cemetery plots. The use as a cemetery was the highest and best, but there was only a partial taking. The opinion quoted outstate authority cited by the landowner which stated fair market value "implies" a proof of comparable sales, and when not obtainable, other method such as for school yards and church yards other methods, such as capitalization must be used.

★ *Land Clearance for Redevelopment Authority v. Morrison,* 457 S.W.2d 185, 192 (Mo. banc 1970), is noted for the reason the landowner sought to establish value by the recognized method of capitalization of rental income approach, while the condemnor adopted a different theory. The condemnor did not contend capitalization "was not available," nor did the supreme court write to the contrary.

★ In *State ex rel. State Highway Commission v. Southern Development Co.,* 509 S.W.2d 18, 27 (Mo.1974), the court set out the three basic methods of arriving at fair market value:

"Comparable sales" consist of evidence of sales reasonably proximate in time and distance and involving land comparable in character ... The "cost of replacement method" is commonly utilized to value improved property and takes into consideration cost necessary to replace the existing structure ... The "Capitalization of Income Method" is utilized to value income producing property when completely taken.

In language not necessary for deciding the case, the opinion stated courts that had authorized the capitalization method had not given carte blanche use, especially where the land was not unique and there was evidence of substantial numbers of comparable sales from the very parcel of ground being condemned. *Id.* at 28.

★ *Northeast Missouri Electrical Co-op v. Fulkerson,* 542 S.W.2d 26, 28–29 (Mo. App.1976), held that capitalization is not appropriate when there is 1) less than a taking of the entire property, and 2) where the land is unimproved.

★ *Board of Public Buildings v. GMT Corp.,* 580 S.W.2d 519 (Mo.App.1979), involved the taking of a downtown St. Louis building used primarily as a hotel. The owner of the land was a family owned corporation which in turn leased it to two of the four shareholders. Those two in turn subleased the operation of the hotel to a man who paid them a flat fee for the transient and permanent guests who used the hotel. The condemnor objected to the use of capitalization of rental income by the owner to arrive at an opinion of fair market value. The Eastern District recognized the rule in this state against use of business profits because of their speculative nature, but found an exception where the owner rents the land rather then using it—profits from the business of renting "one of a peculiar nature," and under the law of evidence the "profits of a rental business" if such renting "constitutes its best available use ... the realized or estimated rentals are a useful guide to the appraiser in valuing real estate." *Id.* at 525. The court, drawing from 1 Orgel, On Valuation Under Eminent Domain, p. 697, admits the distinction between profit in the income from a business "and 'profit' from rents from a rental business cannot always be clearly drawn."

The court further noted the unusual circumstances; this was a "low class" hotel which served transient and permanent

guests in a seventy-five year old building and could not be moved out of the downtown without ruining business. The court upheld use of the rental fee paid by the operator to the shareholders of the owner and did so by characterizing the money as "rental income and not business profit," saying business profits depend on capital employed, skill and good management of the business and "furnishes no test of the value of the property." *Id.* at 527–28. "The crucial question then is whether this income was produced by the use of the property or by the skill and labors of the landowners." *Id.* at 528. *See also City of Perryville v. Stark*, 715 S.W.2d 268, 270 (Mo.App.1986), where the court allowed in evidence on loss of use of a field (used as pasture) as the value was attributable to "inherent qualities of the land and not to any labor expended by the owner...." The opinion reiterated the language of prior cases of the landowner being entitled to have the jury being informed as to all facts of the property which would impress a prudent purchaser. *Id.* at 530.

★ In *Del–Mar Redevelopment Corp. v. Associated Garages*, 726 S.W.2d 866 (Mo. App.1987), the property condemned was improved with a self-service car wash. The condemnor sought a reversal based upon denial of its motion to strike the testimony of landowner's valuation expert which was based *solely* on using the "cost of replacement" method. *See Southern Development Co., supra*, 509 S.W.2d at 27. The condemnor, "chose both the comparable sales and capitalization methods to value Associated's property." *Id.* at 872. The court approved the landowner's expert testimony of an appraiser and a chief executive of a large manufacturer of car wash equipment, saying all evidence of value which an ordinarily prudent buyer for the jury's consideration, *Id.* at 871, and errors in admission of evidence will not be reversed unless there is "substantial and glaring injustice." *Id.* at 869. The opinion states such information as desirability of the use of the site as gaged by visibility, traffic flow, and nation averages as to site usage (a self-service car wash), "would nat-

urally be brought to any buyer's attention in negotiating a sale." *Id.* at 871.

★ *Land Clearance for Redevelopment v. Coen & Co.*, 773 S.W.2d 465 (Mo.App. 1989), is cited by LCRA as authority for granting a reversal. *Coen*, from this court, involved LCRA and Allright, the owner of a surface parking lot in the same downtown loop. Allright took that appeal. By motions, LCRA had sought to exclude evidence of business profits and Allright to exclude comparable sales. Both motions had been denied prior to trial. *Id.* at 466 and 469 n. 3. Nevertheless, evidence of business profits was placed before and argued to the jury by Allright. *Id.* 469 n. 3. As in the case at bar, the condemnor in *Coen* used the comparable method and had utilized several other nearby sales to determine fair market value. As pertinent to this appeal, the landowner in *Coen* argued in essence, that the instruction defining fair market value, MAI 16.02, set out *supra*, misdirected the jury on the "present value of lost future profits from the use of the land ... and that refusal of the court to submit Instruction A tendered by Allright was prejudicial error." *Id.* at 467 (footnote omitted) What Allright wanted to do in *Coen* was submit "MAI 4.01 [1980 Revision] Damages—Personal and Property" in lieu of MAI 16.02. That instruction reads:

> You must award defendant such sum as you believe will fairly and justly compensate defendant [Allright] for any damages you believe defendant sustained and is reasonably certain to sustain in the future as a direct result of the taking by plaintiff on March 12, 1984, mentioned in the evidence.

This court decided this point in the following manner at pages 468–9:

> The ultimate issue for submission to the fact-finder, therefore, was the fair market value of the land taken totally in condemnation. The use of MAI 9.01 model for that purpose was mandatory, as was the definition of fair market value rendered by the MAI model. Notes on Use, MAI 9.01 and MAI 16.02. Instructions 6 and 7 were the mandatory and proper submissions under the evidence.

Instruction A tendered by Allright and formulated as a modification of MAI 4.01 was properly refused. The point of error is denied.

(Footnote 3, *supra,* as paraphrased, ended with this observation:

Although the court refused the tender of Instruction A the evidence of business profits, quite anomalously, remained before the jury throughout.

Before deciding the point on instructional error, the court, in language not essential to determination of the point, discussed the capitalization of profits method. *Coen* pointed out business profits do not usually bear as admissible evidence of the value of the land on which the business is located because of its speculative nature. *Id.* 467–68. It further states the just compensation mandated by the constitution means fair market value, and *"fair market value* of property imports proof of sales of similar property...." *Id.* at 468. The opinion goes on further to say that even if the property was not singular such as in *Union Quarry* and *Mt. Moriah, supra,* where a business conducted on the land is so "inextricably entwined" so that a taking of the land means a taking of the business, and there is clear and certain evidence of net profits, the capitalization method may be used, but only when there is no abundant evidence of comparable sales.

Several indicators or themes may be drawn from the cases just noted, with the exception of *Coen.* 1) Comparable sales of arm's length sales is the preferred method of estimating fair market value of an entire parcel of developed property; 2) Capitalization of profits is susceptible to too many vagaries, to too much manipulation and can be greatly influenced by the particular business skill and acumen of the condemnee; 3) The more evidence relating to value, or of what a prudent buyer would rely upon in making an offer should if properly substantiated be admitted with its weight given by the jury.

*Coen,* does not aid LCRA, for it was a case where the landowner, after getting in its evidence of business profits and not getting the verdict it wanted, appealed on

the basis the MAI mandated instruction on fair market value was fatally defective. That point was properly denied, and the rest of the opinion language pertaining to use of business profits evidence when there was evidence of comparable sales, is dicta.

■ Despite the implications of dicta in *Coen,* the court feels in this case the business of operating a multi-story parking garage was inextricably entwined with the land. A similar facility located anywhere in the Kansas City area, other than within the downtown business loop, would be an economic failure. The evidence in the case at bar showed a continued demand for downtown parking, despite lagging forecasts in the retail sector, well into the twenty-first century. A valuation based on the theme of several comparable sales should not be the only method of determining fair market value.

The better practice, as several of the earlier cited cases recognize, should be to allow the jury to hear and weigh as much relevant and material evidence relating to value as possible. The language of MAI 16.02 on definition of fair market value does not limit any such evaluation to evidence based solely on comparable sales. The Colorado Supreme Court in *Denver Urban Ren. Auth. v. Berglund–Cherne Co.,* 193 Colo. 562, 568 P.2d 478 (banc 1977), said all three methods of ascertaining value are intended to provide an expert with a method of determining fair market value, although comparable sales is the best evidence. *Id.* at 480.

That court recognized that although some jurisdictions limit the capitalization of income approach to situations where there are no comparable sales, "we believe the better rule is to permit its use even if other methods of appraisal are available." *Id.* at 481 (citations omitted). The opinion recognized factual circumstances may cause one method to be more appropriate than another, but:

No purpose is served by limiting testimony to one approach or to the most appropriate method of attaining an opinion as to value. Recognition should be given to

all relevant facts which tend to provide a means for arriving at a fair evaluation. [3] The trier of fact has the duty to weigh the opinion and judge the credibility of an expert witness on value to determine which of the three approaches is most indicative of the actual market value of the property to be condemned. 568 P.2d at 481.

■■■■ The simple conclusion here is that left alone PSI would have continued to make a solid profit from this land as a garage. The parking demand for downtown was easily calculable, costs very certain, and no new land for parking in the downtown loop likely. Any reasonably sophisticated buyer would have looked at PSI's use and business profits in capitalizing or reaching a present value to put on the land in the form of an offer to purchase. Here there was a taking of the whole property and with it the whole business which was interrelated with the property of operating a private downtown parking garage, the highest and best use. Although LCRA contested the garage being the highest and best use, it tacitly conceded by its experts the demand would remain constant for five to ten years. Revenues and costs of operation of the business and repair of the building were most predictable. Therefore, even though comparable sales is a preferred method, business profits, where there is a complete taking of land improved to its highest and best use and business figures are certain and easily calculable, should, in the sound discretion of the trial judge be admitted. Therefore, the trial court cannot be convicted of an abuse of discretion in allowing the landowner to introduce evidence on capitalizing of profits. To reach a contrary conclusion would be to hold that where the property is other than unique (like cemeteries or urban trash dumps) proof of similar sales is the sole and exclusive means of fixing fair market value. This court does not adopt this conclusion. Although the business use here was "inextricably entwined" to the land under *Coen*, and the use was not as "singular" as in *Union Quarry, supra*, or *Mt. Moriah, supra*, it must be concluded the actual location of this parking lot, and

not any specific expertise of the owner-operator led to its profitability. From the nature of this business, the facts here are much closer to the land use being unique than, for instance the use being for a trendy restaurant.

If either party wants to use capitalization of profits in addition to admissible evidence of comparable sales, they bear the burden of convincing the trial court based on the above mentioned criteria of the evidence (lack of conjecture—reliable future figures). That such evidence should be allowed.

This conclusion cuts both ways: if comparable sales are quite high and profits and future income look low the condemnor should be allowed to introduce the proper profit figures. *Arkansas State Highway Commission v. Barnes*, 263 Ark. 567, 566 S.W.2d 148, 149 (1978).

■■ As the court did not err in admitting use of business profits evidence, nor did it err in allowing PSI's experts to project those figures some 40 years to the year 2025. These projections were made on the basis of over fourteen years prior results. Although this is a long period of time to predict, PSI's experts were competent and qualified, most being college economics professors. Any questions as to their calculations and methodology were exposed on cross-examination, which went to the weight of the evidence, not the admissibility. *Wiley v. Pittsburg and Midway Coal Mining Company*, 729 S.W.2d 228, 233–34 (Mo.App.1987). The demand for downtown parking was shown for this period. This evidence was not so speculative to keep the evidence out or caution the jury. *City of St. Louis v. Vasquez*, 341 S.W.2d 839, 847 (Mo.1960). Under the general rule laid out in *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo.1968), the anticipated profits were made "reasonably certain by proof of actual facts," so there was no abuse of discretion in letting in evidence of future income and allowing a fair method of capitalization of those profits. The fact the verdict was greater than the commissioners' award

does not make it excessive, as long as supported by the evidence. *Id.*

In a somewhat related point LCRA, argues PSI expert witness Joy, Eaton, Farout and Burns were not competent or properly qualified as experts on the value of real estate. Joy is a professor of business, the others are college economic professors who were allowed to offer as experts opinions as to the future profits of the Mutual Garage owner. It further argues there was no expert testimony to link the projected forty year profit evidence to the fair market value on the date of taking. This point rests on the theory there was no recognized real estate appraiser to take the future profit evidence and translate it into a real estate appraisal. The argument is, PSI expert Fern, "did not use the future profit professors' projections" for his estimate of approximately $1,725,000, nor did the PSI owner Rubin for his opinion of $2,775,000 million. (LCRA does not here contest Fern's qualifications to value real estate. Rubin offered an opinion as owner of the property.)

Even if this point was correct, there would be insufficient grounds to reverse this case for failure to strike the future profits testimony. The verdict here was within the range of the Fern and Rubin opinions, and will stand. *Vasquez, supra,* at 852; *State ex rel. State Highway Commission v. Schwartz,* 526 S.W.2d 952 (Mo. App.1975).

## II.

■ Next, LCRA seeks relief from the trial judge having allowed PSI to introduce evidence of "project influence" in order to enhance damages. PSI's evidence had shown a continued strong demand and short supply of parking in the vicinity of the property. LCRA's experts and evidence said, that without its project for a larger and more modern parking project, there would be at best only another five to ten years of the same continued parking demand. PSI was then allowed to use the testimony of the operator of the garage LCRA built after the taking. Also, the trial court, over LCRA's objection, allowed introduction into evidence a color photograph of the LCRA garage.

LCRA points to the case of *St. Louis Electric Terminal Ry. Co. v. MacAdaras,* 257 Mo. 448, 166 S.W. 307, 310 (banc 1914), for the longstanding rule stating:

... when the whole property is being taken, [the rule] is not to allow the jury to consider either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken. In other words, the value should be determined independent of the proposed improvement.

The trial court allowed PSI's rebuttal evidence on the actual structure and operation of the publicly owned and subsidized garage built on the subject property reasoning LCRA had opened the door by its evidence rebutting PSI's lack of there being continued and increased parking demand in the area. LCRA states the prejudice to it was "severe and obvious" for the following reasons which are here paraphrased and summarized in the interest of brevity: 1) it allowed the jury to value the property based on its value and need of the condemnor, not as to the landowner, and 2) it allowed the landowner to enhance its claim in conjunction with the lost profits evidence.

It is true the general rule is to value the property at the time of the taking, evidence of conditions after that are irrelevant. *Kansas City Power & Light Co. v. Jenkins,* 648 S.W.2d 555, 562 (Mo.App.1983). It is further mandated the "just compensation" to be paid the landowner is what the landowner loses, not on the basis of the need of or value to the condemnor of the property taken. *Union Electric Company v. Pfarr,* 375 S.W.2d 1, 8 (Mo.1964).

A ruling here against the condemnor does no violence to these rules nor keeping out implications of the project influence doctrine. The landowner ran a parking garage for a long period of time and brought forth expert evidence of a continued demand for an additional forty years. The condemnor countered by expert testimony of only five to ten years more demand of parking then demand falling off

and the necessity of erecting a new building, preferrably an office type structure. As with the issue of the highest and best use, it would have been unfair to say PSI had not put the land to its highest use by not planning to assemble contiguous property within the next ten years. After the taking and pursuant to the plan at the inception of the LCRA project, the old parking structure was torn down and a new one with more than three times the capacity was to be built.

The subject of the continued parking demand was properly before the jury. The project here did not enhance the property it showed a continuing demand for parking which the condemnor had vociferously denied by its evidence. As this court said in *Jenkins, supra,* at page 563:

> Faced with these ironies, we cannot escape the conclusion that, at the very least, the project-influence doctrine does not immunize the condemnor's conduct from the scrutiny of the jury where it adduces evidence as to the lack of utility of the landowner's property for general industrial uses in a case in which it has promoted the sale and use of the same and nearby land for exactly those uses. We hold that the industrial demand for the property, on these facts, does not fall within the project influence doctrine.

In any event, there is no way of showing any prejudice to the condemnor, the verdict was well within the limits of the range of opinion as to fair market value. This point is denied.

### III.

LCRA's next point concerns the testimony of PSI's president, Rubin, and another PSI witness testifying the taking was against the will of the landowner. Rubin testified he had to cut back rates during the six month period between the date the condemnation petition was filed and the date of taking because customers hearing of the condemnation started seeking parking elsewhere. Rubin and another PSI witness testified PSI's legal expenses went up in attempt "to battle this very condemnation." The court sustained LCRA's objections to all this evidence which was improper but did not declare a mistrial. The court not having imposed such a drastic remedy as a mistrial will not be second guessed.

### IV.

LCRA's last point lodges a multitude of prejudicial error emanating from, among other things, the use of the verdict forms used. Although not all inclusive, LCRA cites the use of verdict form using the word "damages," without definition, instead of its proffered verdict using the term "fair market value" of defendant's property as of October 7, 1985 (the day of taking). LCRA states this gave the jury a "roving commission to consider unspecified additional damages."

As stated in an earlier point, the instructions were MAI mandated—there is no contention of instructional error as was the case in *Southwestern Bell Telephone Co. v. Kroupa,* 403 S.W.2d 931 (Mo.App.1966), cited by LCRA. This point is answered by the following language in *Davis v. Stewart Title Guar. Co.,* 726 S.W.2d 839, 857 (Mo.App.1987):

> Instructions from the jury of the law and what their decision must be, based on that law. That is to say instructions are the guide to a proper verdict. A form of verdict, however, is not an instruction. A verdict is the decision rendered by the jury under the instructions of the court. In a suit for damages, it is the decision of the jury as to which side wins, and how much. A form of verdict is the medium to record the decision of the jury. It is not the device, therefore, to find breach of performance, vexatious delay, damages—or any other issue.

(Citations omitted).

This point is denied. On the appeal of LCRA, all points are ruled against it. The judgment is affirmed.