**STATE of Missouri ex rel. STATE HIGH-WAY COMMISSION of Missouri, Plaintiff-Appellant,**

v.

**A. J. ELLIS et al.**

**Exceptions of C. Arch BAY and Virginia E. Bay, Defendants-Respondents.**

No. 8308.

Springfield Court of Appeals.

Missouri.

Sept. 17, 1964.

William T. Powers, Jr., Springfield, for plaintiff-appellant.

J. Weston Miller, Miller, Fairman, Sanford, Carr & Lowther, Springfield, for defendants-respondents.

RUARK, Presiding Judge.

This is in condemnation on the question of just compensation. Plaintiff, now appellant, is the State Highway Commission, which we will hereafter refer to as "Highway." In 1954 it engaged in a project which involved widening and other construction on Route 65 along Glenstone Avenue, which runs north and south through the eastern portion of the City of Springfield. The old highway was two-lane pavement (the exact width of which we are not sure) with wide shoulders covered with chat or crushed stone, part of which had some kind of asphaltic covering and part of which had some kind of oil. It seems to be conceded by all parties that Glenstone was a reasonably busy street. Defendants Bay (hereinafter called Owners) owned five properties along this street. Two of them, a restaurant building (or steak house, as the Owner called it) and a filling station, were both included as Item 19 of the Petition. They were located on a tract at the northeast corner of the intersection of Glenstone and Grand Street. Another tract, sometimes called "the root beer property" or the "drive-in" (Item 17), lay on the southwest corner of the intersection of Glenstone and Belmont, which is the first street north of Grand. Yet another property was a grocery store (Item 20) located on the southeast corner of Glenstone and Grand; but, since no damages were allowed in respect to it, we need not consider it further. The area was one suited to businesses which served those who come by automobile. The business properties above-mentioned were devoted to purposes for which they were adapted and, as was said, at least in respect to the filling station (over which rages the greatest controversy in regard to Owners' compensation), to the "highest and best use." A short distance south of these business properties was a residence which, because of the size of lot (fifty-foot front), the parties also

seem to agree was devoted to its best use. We will consider it separately hereafter.

We refer back to the business property in the block between Grand and Belmont. All of this was situate on a grade to conform to the then street level. The restaurant and filling station sat on a tract fronting approximately two hundred ten feet on Glenstone. Sixty feet of it was devoted to the restaurant and (the corner) one hundred fifty feet to the filling station. Depth of the filling station property apparently was one hundred twenty feet. Previous to this taking, Owners had at their own expense installed an underground drainage system, consisting of a fifteen-inch pipe with iron gratings. This conformed to the existing street grade and, according to Owners' evidence, took care of the drainage perfectly. They had also paved completely out to join the then existing street paving, all this according to Highway's specifications. There was no curb and gutter. This left what was referred to as one hundred per cent level access across the full two-hundred-ten foot front of the two businesses. That is, customers of the filling station or restaurant could turn in or drive out anywhere along that distance. The filling station building extended thirty-two feet north and south and twenty-four feet east and west. It was frame with white brick veneer and plastered interior, on foundation, with office and display room, two rest rooms, wash room and rack, grease room with drain. It had attic or overhead storage space and compressed air hoists both inside and outside; in front was a pump island with three self-metering pumps in operation. Driveways, between the building and the island, and between the island and the then property line, were ten feet in width. This property had been leased to an oil company on a (then) standard one cent per gallon rate. Average gross annual rentals received based on such gallonage in the five years previous to the date of taking were approximately $1,802.27.

The restaurant or "steak house" building, eighteen by forty feet plus rest rooms (ad-

ditions), was on foundation and had wood floor covered with tile, kitchen, and booths with room to serve thirty-six people, exclusive of the bar and stools. This was leased as a dinner house at $90.00 per month, plus five per cent of the gross volume of business. Average rental was $150.00 per month.

The drive-in (or "root beer") property on the other side of the street up the block at the intersection of Belmont and Glenstone had a frontage of one hundred fifty feet and also had level "one hundred per cent access." The building was frame with logs nailed to the outside in order to give a rustic effect. Its dimensions were twenty-two and seven-tenths by twenty-six feet. On the front it had a porch effect with what appears (from the Defendants' picture exhibit) to have been a serving counter running across the front. This property was devoted to the sale of root beer and soft drinks, coney islands, hamburgers, et cetera. Owner valued the building alone at $5,000.00. Distance from the front of the building to the then (before) property line was variously stated at twelve to fifteen feet. According to the Owner, there was (before taking) room for customers to park in front or drive around and park at the sides and in the rear. Owners had leased this property for six years from July 2, 1952. Rental was $125.00 per month.

The date of taking was July 2, 1954. The construction by Highway involved the building of a four-lane highway (instead of the previous two-lane) with a parking lane on each side and curb and gutter. The project required the taking of an additional *five feet* of land across the fronts of Owners' property on both sides of the street and a change of from seven to ten inches in grade. Limited entrances or driveways through the curb and gutter were provided instead of previous complete, level, and unrestricted access. The chief designer for Highway testified that the construction left a "sharp dip" at the front of the filling station property.

The commissioners awarded Owners $1,125.00 for the drive-in property and $1,700.00 for the restaurant-filling station, nothing for the grocery store or residence. Owners excepted, and the case was tried by the court without a jury.

In this trial, Owners' evidence was that the filling station, as it then existed, was in practical effect rendered useless because the appropriation of land off the front left only five feet of space outside the pump island. The restoration of usefulness required the moving back and restoration of the station with its pumps, lifts, wiring, et cetera (at an estimated cost of $4,000.00), the acquiring of additional land at the rear in order to make room, and also the grading off of the lot to meet the change of grade and repavement of such (total cost for that according to the Owners was a little more than $4,000.00). Estimates of various witnesses for the Owners were that the filling station property had suffered an over-all *decrease* in before and after value in amounts ranging from $13,000.00 to $6,500.00, and that the restaurant property had suffered a *decrease* in before and after value ranging from $3,000.00 to nothing. Two witnesses (Dennison and Riebold) for Highway considered the restaurant and filling station as one property and in answer to the question propounded by its counsel—"Taking into consideration, immediately after July 2nd, 1954, the date of taking, the projected construction of a six lane highway, curbs and guttering, deceleration lanes, pavement, condition of the new construction, new pavement, do you have an opinion as to the market value of that property after July 2, 1954?" —stated that there was an *increase* in over-all value of the combined or whole property of $4,500.00 and $3,700.00, respectively. The trial court found that Owners were entitled to just compensation of $5,000.00 for the filling station property and nothing for the restaurant property.

As to the drive-in property, Owners' witnesses variously estimated that it had suffered an over-all *decrease* in before and after value ranging from $5,000.00 to $3,000.00.

It was their view that, because of the loss of space in front of the building, the property had lost its usefulness for the purpose to which it was adapted and had been devoted. Another reason offered (by at least one of Owners' witnesses on cross examination) was the lessening or difficulty of access due to construction of two driveway entrances through the curb and gutter. Highway's witnesses, Riebold and Dennison, gave estimates of an *increase* in value of $1,800.00 and $2,000.00. As to this drive-in property, the trial court allowed just compensation in the sum of $3,500.00.

The court also allowed $500.00 as compensation for appropriation under a construction easement at the front of the residence.

The over-all total found for just compensation was $9,000.00. To this amount the court added interest at six per cent on the sum of $6,175.00 (the difference between the $2,825.00 deposited as commissioners' award on July 2, 1954, and the amount found to be due as just compensation on date of judgment, September 20, 1963).

Highway's first assignment is that the addition of interest on the amount in excess of that deposited for the taking was error; that the "interest statute," § 523.-045 V.A.M.S. (S.B. No. 248, Laws of 1959), should not be applied retroactively because such statute deals with substantive rights. That section, as appellant contends, deals with three situations: (1) where the condemnor abandons the project, (2) as here, where the verdict or judgment is in excess of the commissioners' award, and (3) where the verdict or judgment is less than the amount of the award. Prior to the adoption of such section this court had stated in Arkansas-Missouri Power Co. v. Hamlin (1956), Mo.App., 288 S.W.2d 14, and again in State ex rel. State Highway Commission v. Galloway (1956), Mo.App., 292 S.W.2d 904; Mo., 300 S.W.2d 480, that where the verdict and judgment were in excess of the award it was necessary to add interest to the amount set forth in the verdict in order to preserve the constitutional-

ity of our procedures for taking of private property for public use, the interest so added not being interest *eo nomine* but a part of just compensation for deprivation of the land. Thereafter the Supreme Court in State ex rel. State Highway Commission v. Green (1957), Mo., 305 S.W.2d 688, held that the mechanics suggested by the two cases aforementioned, that of having interest added by the trial judge instead of being found by the jury, was improper; and, while the court in that (Green) case refrained from passing on the substantive question as to whether or not the landowner was entitled to interest on a deficiency between award and judgment, it did suggest (loc. cit. 695) that if the matter was called to the attention of the legislature it might authorize the trial judge to enter judgment for the additional amount. Subsequent to that decision, § 523.045 was enacted.

In St. Louis Housing Authority v. Magafas, Mo., 324 S.W.2d 697, and in City of St. Louis v. Vasquez, Mo., 341 S.W.2d 839, the addition of interest was again considered (see also Mayor, et al, v. Boggess, Mo.App., 332 S.W.2d 305), and the right to award of interest on the increased amount was upheld. Both of these cases dealt with situations which arose *before* the enactment of § 523.045.

■ It is our conclusion that the right of the landowner to interest on the difference between amount deposited for the taking (as mentioned in No. 2 above) and the amount finally adjudged was the substantive law of the State of Missouri in existence at the time § 523.045 was enacted and that insofar as such section provided for that right it was declaratory only of the then existing substantive law. The vehicle by which the substantive right was to be enforced and made effective (by addition to the amount of the verdict) was only procedural in providing method and mechanics for its attainment. In other words, the right (of the landowner to interest on amount of compensation not deposited) already existed. The statute simply pro-

vided a simple way of getting it. Hence it seems to us that there is no question of the retroactive operation of the statute as to a substantive matter insofar as it applies to this situation. It is true that the trial court, in entering judgment for the interest, referred to § 523.045. We think that it was his intention to make such reference as authority for the procedure which he followed; but if he intended it as creating authority for the *existence* of the right to interest it would not be reversible error; for a right judgment for a wrong reason is nevertheless right.

Assignment No. 2 has reference to the refusal of an exhibit. Owners' witness Ryan testified that he was familiar with the properties and with property values in that area in 1954. For five years prior to 1955 he had been associated with a real estate agent and with a title company. For a year before July 2, 1954, he had worked as office manager for a real estate brokerage company and "was inspecting and handling and familiar with sales, offers for sale, leasing of properties of this kind and character." And, "I was on that property time and again prior to that [July 2, 1954]."

"Question: As a real estate representative?

"Answer: I was on the property as a real estate representative, too."

He got a license as a salesman sometime in 1954—the exact date he did not remember —and as a broker in 1955. He testified as to before and after values. Highway offered Plaintiff's Exhibit No. 2, which was a certificate from the State of Missouri Real Estate Commission stating that Ryan was originally licensed as a salesman on December 3, 1954, and as a broker on May 16, 1955. On objection of Owners, the court looked at the exhibit and refused it as having no probative value.

■ Highway offers no authority to support its claim of error. (See Ayres v. Keith, Mo., 355 S.W.2d 914[6]). As nearly as

we can grasp the argument, it is that, since the witness stated that he was familiar with the property in his capacity of "real estate representative," the exhibit would disprove such fact. The witness had stated his actual experience and familiarity with real estate in that area and with these tracts in particular. He did not state that he was a salesman prior to July 2, 1954. The exhibit did not contradict any fact to which he had testified concerning his familiarity with the land and its values, and it is not contended that he was not familiar with values at the time he said he was. It is conceded that one need not be a licensed real estate salesman or an "expert" in the ordinarily accepted sense in order to qualify as to opinion of values. State ex rel. State Highway Commission v. Bloomfield Tractor Sales, Inc., Mo.App., 381 S.W.2d 20.

We think it would not have been error to admit the exhibit. It was not prejudicial error to refuse it. Murphy v. Kroger Grocery & Baking Co., Mo.App., 185 S.W.2d 62(8, 9); State ex rel. State Highway Commission v. Cone, Mo., 338 S.W.2d 22, 27; Union Elec. Co. of Mo. v. Simpson, Mo.App., 371 S.W.2d 673.

Appellant's third contention deals with damages alleged to have accrued because of the cutting of the roots and consequent destruction of a shade tree in front of the residence property.

Under Paragraph 21 of the Petition, Highway took what is denominated a "temporary construction easement for the purpose of building a sidewalk and walk entrance to the highway" and of providing room for men and machinery in doing such construction work. The paragraph asserts that "after construction is completed and the entire project is accepted by the Relator," the Owners should have full and free possession. The strip so taken was across the front of the residence property, three feet in width during a part of its course and jutting or turning into the residence property a distance of ten feet at one place. Owners filed their general exceptions to the

commissioners' award of damages to the property described in said Paragraph 21; later, on leave granted by the court, Owners filed their "Amendment to Exceptions" in reference to Paragraph 21, in which they specifically set forth that in the construction therein referred to Highway cut the roots of a large shade tree, thereby destroying it and rendering it so unstable as to cause it to fall upon the residence. We gather that it fell *after* the construction had been completed.

It would appear from the evidence the trunk of this tree arose on the front yard, not *out* of the strip so taken for "construction purposes" but immediately adjacent thereto and apparently in the corner (made by the change of three feet to ten feet). The contractor in performing the work of the improvement dug or made an excavation within the land so taken but immediately adjacent to the trunk of the tree, apparently on two sides thereof, a vertical distance which we do not find stated in the record but which from the appearance of the photographic exhibits would *appear* to be some two and one-half feet. In making such excavation the roots of the tree at such point were necessarily (as such exhibits show) cut and removed. As a result of such severance the tree was caused to fall over and defendants were, of necessity, required to remove it. Two of Owners' witnesses testified to a difference of $1,000.00 in before and after value of the residence property. One of Highway's witnesses testified to *no* difference. The court allowed a total of $500.00 because of the appropriation set forth in Paragraph 21.

The complaint in this assignment is not as to the *amount* of such allowance, but Highway contends (a) the court was in error in permitting the defendants to amend their exceptions; and (b) that the damage claimed resulted *after* the appropriation and "is not chargeable to the condemnor, absent proof of negligence as part of the condemnation."

▇▇▇ As to (a), amendment to the exceptions: No formal or specific pleading as to damages is required of the landowner in making exceptions as to the award of commissioners. All he needs to do is to make his exceptions. Arkansas-Missouri Power Co. v. Hamlin, Mo.App., 288 S.W.2d 14(10); Missouri Power & Light Co. v. Creed, Mo. App., 32 S.W.2d 783. We think the amendment was immaterial and, at all events, was within the discretion of the court.

▇▇▇ As to (b), both parties rely upon Kamo Elec. Co-op. v. Baker, 365 Mo. 814, 287 S.W.2d 858, which contains a careful and well-supported discussion of the point raised with citation of many authorities.[1] As we understand that case, the question of damages is to be determined with reference to the time of appropriation (loc. cit. 861). Where part of a tract is taken, damages are not limited to those which result from mere severance of title but include damages or depreciation in value of the tract as a whole which is caused *by the use of the property for the purpose for which the condemnation is made* (all italics are ours), and such use includes the construction of the improvement. The recovery is limited to (and should include) such damage, *whether present or prospective,* which may be known or *may reasonably be expected to result from the construction in a lawful and proper manner* (loc. cit. 862). The recovery of just compensation is for the result of lawful appropriation and not for tortious acts. Where there is an appropriation of a part of the land, the lawful and proper uses to which it is to be put may be considered if

---

1. For others applicable to some phases of the discussion, see State ex rel. N. W. Elec. Power Co-op., Inc. v. Waggoner, Mo.App., 319 S.W.2d 930, 937; Union Elec. Co. of Mo. v. Simpson, Mo.App., 371 S.W.2d 673; Union Elec. Co. v. Saale, Mo., 377 S.W.2d 427; Public Water Supply Dist. No. 2 of Jackson County v. Alex Bascom Co., Mo., 370 S.W.2d 281; see Jahr, Eminent Domain, § 167, p. 270.

they affect the (value of) remainder of the land at the time of the appropriation; and, referring to the results which "may reasonably be anticipated" the fact that the things *did* occur may substantiate the claim that they *could* have been so anticipated.

The questions then are: Was the excavation done lawfully; was the digging (and consequent cutting of roots) a part of the appropriation; and was the destruction of the tree reasonably to be anticipated? Parenthetically, in regard to this appropriation, while the *trunk* of the tree stood just beyond the limits of the land actually covered by the description, a part of the tree itself— the roots necessary to support it and sustain its life—was actually within the confines of property appropriated for the construction purpose, and these roots were actually severed; hence in all *practical effect* the tree itself was taken.

■ Was the severance of these roots a necessary part of the lawful taking? We refer to the testimony of Highway's witness who identified himself as Chief Designer, Missouri State Highway Department, District 8, and one of the designers of the project here involved. He identified the official plans and exhibits delineating cross-sections which showed the difference in elevation from seven to ten inches between the original ground level and the roadway *as finally constructed*. In reference to the exhibits showing the excavation on the residence property in order to build the sidewalk, he testified that they showed "the bottom of our base which you have to grade out for in order to go ahead and build your highway." The grading out had to be done first to establish the grade. The base is put in and the concrete is put on top of that. In building the sidewalk it was necessary to *cut in or down* and then build the concrete above it. He said such action would be *necessary* for whoever, whatever contractor did the work in carrying out the construction plan. Nor is it contended that this grading or digging down in order to reach the level upon which

the base was built could have been done *without* cutting out a substantial part of the tree roots. It would seem to us, therefore, that the excavation or grading out of the land below the previous ground level, and the severance of the tree roots which necessarily accompanied it, was a lawful part of the construction use for which the land was appropriated and not a tortious act but an exercise of the sovereign right of eminent domain, because of which the owners were entitled to just compensation irrespective of whether it be referred to as a "direct taking" or "consequential damage" to the remainder of the tract. It also seems that the loss of the tree was a result obviously to be anticipated from the cutting of the roots.

Appellant's next complaint is "that the court erred in the judgment rendered for the reason it was excessive, not responsive to the most credible evidence, and was based on testimony which included non-compensable elements of damage which should have been stricken and withdrawn from the court's consideration in arriving at the judgment in accord with plaintiff's objections and motions to strike."

■ This assignment follows that set forth in Paragraph 8 of the motion for new trial. We think the assignment is too general, and we are doubtful whether it was sufficient for the motion for new trial. The object of calling attention to matters in the motion for new trial is to give the trial court an opportunity to correct its own errors. Arnold v. Fisher, Mo.App., 359 S.W.2d 602(10); State ex rel. McNutt v. Northup, Mo., 367 S.W.2d 512, 514. While such motion need not set forth the objections or reasons given, it should in all events contain language which calls the trial court's attention to evidence which forms the basis for the new-trial specification of error. State ex rel. Kansas City Power & Light Co. v. Salmark Home Builders, Inc., Mo., 375 S.W.2d 92, 95–96.

■ An assignment of error on appeal should be sufficiently definite to "show what

actions or rulings of the Court are sought to be reviewed and wherein and why they are claimed to be erroneous." State ex rel. State Highway Commission v. Warner, Mo.App., 361 S.W.2d 159, 162. Nevertheless we have attempted to "seine through" Highway's argument on this point (and indeed the whole transcript) in order to find exactly what is complained of. This argument states that a "pattern of error" is shown by some nine quoted excerpts from the testimony. It would unnecessarily extend the length of this opinion to set them all forth, but since the first two of such excerpts are not long we set them forth to illustrate:

"Question: After and immediately following this taking, could your filling station be used for the purpose for which it was built at all, practical matter?

"Answer: Well, you could have used it but, but for practical purposes, it would not have maintained—it would have been impossible for people to get in. We could serve one car.

"Mr. Powers: I object to that, Your Honor, on the basis that inconvenience of that nature is not an item of damages in this type of case.

"Mr. Miller: I am not relating to the construction. I am saying, after the taking and after the construction.

"The Court: The objection is overruled.

\* \* \* \* \* \*

"Question: And, after the taking of this five feet in July, and the construction work done there in connection with the construction easement, what had it done to your special purpose filling station—

"Mr. Powers: Your Honor, I object to any mention of any damages resulting from construction.

"Mr. Miller: I am not talking about during the period. I said, after the construction.

"The Court: That's the way I understood the question. The objection is overruled."

The argument concludes with the statement that the excerpts show a pattern of admission relative to *inconvenience, traffic flow, loss of profits,* and *injury to business.*

 From the outset Highway contended that Owners had sustained special benefits from the appropriation and construction in excess of their loss, and the testimony of its witnesses dealt extensively with this. Some of the evidence, especially that in regard to "traffic flow" and convenience or inconvenience of access, concerned the benefit—or lack of benefit—to the premises. We will attempt to deal with that more fully in Highway's next assignment. The argument concludes by citing Filger v. State Highway Commission, Mo. App., 355 S.W.2d 425, which we believe holds that (1) traffic is an incident of streets and highways and cannot be considered as an element of damage or benefit, and (2) alteration of traffic pattern on an existing right of way which does not materially block reasonable accessibility is not an item of damage. The only other case cited by Highway is St. Louis Housing Authority v. Bainter, Mo., 297 S.W.2d 529, which holds that *profits* derived from a business are too uncertain and speculative to be considered as a basis for determining fair market value of the property condemned, but gallonage of gasoline sold from a filling station is proper in determining rental value; and rental value is, in turn, a proper aid in determining market value. We conclude that Highway is principally concerned with that evidence which deals with the accessibility of the businesses (filling station and drive-in) and the loss of rental income as indicating the loss or injury to such business as a result of the inconvenience in access. As to the inconvenience and inaccessibility at the filling station, the evidence showed (after the taking) a sharp dip in place of a level driving space and the leaving of (only) a five-foot lane (outside the pump island), a situa-

tion which made it inconvenient and impracticable for customers to maneuver alongside the pumps. Such inconvenience and accessibility in practical effect destroyed the business of the filling station as it then existed. The Owners then offered evidence to show the cost of grading down and moving back the filling station on the theory of cost of restoration of its use to which the property was adapted. We think this was proper. State ex rel. State Highway Commission v. Bruening, Mo., 326 S.W.2d 305.

■ As to the drive-in (root beer property) the change effected (in addition to the loss of five feet of ground) was two entrances through curb and gutter instead of a level access along the front and (according to Owner's evidence) the loss of sufficient car space for use by customers in front of the drive-in. Owners also offered their lease in order to show the rental value. We think there is no question that the rental value of property is of value in determining the market value, and it is proper to consider the leases on the property, the income from such, and the lengths of time they are to continue. City of St. Louis v. Rossi, 333 Mo. 1092, 64 S.W.2d 600, 607. See State ex rel. State Highway Commission v. Vorhof-Duenke Co., Mo., 366 S.W.2d 329, 340.

■ The testimony as to "loss of the business" in these instances was not as to the *profits* from such businesses but as to the ability of the businesses to continue after the taking and the consequent loss in rental, and therefore it concerned market value. In respect to the drive-in, Owners went further and showed that the business actually "petered out", the lessees did not continue to pay rent, and the building was eventually moved off. The fact that a person could not continue or pay his rent and the business closed is somewhat speculative as to whether such failure resulted from the appropriation rather than from other

causes; but, when taken along with the other evidence and the surrounding circumstances, it had some probative value in bolstering and corroborating the contention that the value of the property (as devoted to the purpose for which it was then adapted) depreciated because it was no longer fit for such purpose.

The final complaint is that the court erred in ruling that the "special benefits" testified to by Highway's witnesses were "general benefits." These witnesses testified that Owners' property received special benefits from (a) construction of curb and guttering (b) improved access, (c) improved drainage, (d) intermittent traffic rather than continuous traffic, and (e) "de-acceleration lanes." Testimony of Owners' witnesses was to the exact contrary.

■ We see no need to enter into any extended discussion as to what are "special benefits" as opposed to those which are "general" to all property in the vicinity;[2] for *assuming* that all the matters contended by Highway could legally be said to be special benefits, still it was Highway's burden to prove that they were *in fact* benefits. We have our doubts as to whether a change of traffic pattern or increase in volume along a previously established highway, *as such*, can ever be the basis for a claim, either of damages or special benefits; but certainly if traffic flow is claimed as a special benefit it is proper for the owner to show, and the trier of the fact to consider, how such change would interfere with access and prevent patronage from prospective customers. State ex rel. State Highway Commission v. Johnson, Mo., 287 S.W.2d 835.

■ As to the so-called "de-acceleration lanes," if we understand what counsel meant by them, they were the outside lanes, a portion of which presumably occupies the

2. See State ex rel. State Highway Commission v. Vorhof-Duenke Co., Mo., 366 S.W.2d 329; State ex rel. State Highway Commission v. McCann, Mo.App., 248 S.W.2d 17; State ex rel. State Highway Commission v. Bailey, 234 Mo.App. 168, 115 S.W.2d 17.

five feet (on each side) which was appropriated for permanent use. Referring to Highway's Petition, we find that it takes for purpose of construction and use a four-lane highway with a two-foot painted median and an *eight-foot parking lane* on each side. The condemnor has the duty of specifying with reasonable certainty the burden it expects to place on the land. Shell Pipe Line Corp. v. Woolfolk, 331 Mo. 410, 53 S.W.2d 917. The presumption is that the land taken by the exercise of eminent domain will be used for all purposes which the judgment permits. State ex rel. State Highway Commission v. Johnson, Mo., 287 S.W.2d 835. We must assume that these outer strips will be used for the purpose taken, i. e., parking lanes.

As to "intermittent traffic" rather than "continuous traffic," one of the Highway's witnesses based this on a signal light at the corner of Glenstone and Grand. It is unnecessary for us to consider whether the installation of a traffic light on a previously existing street or highway can ever be considered as a "special benefit," for in this case there was evidence from which the trial court could have found that the traffic light existed *prior to the taking* with which we are concerned. Aside from that, it is at least an arguable question as to whether a line of cars stopped for a traffic light in front of a corner business devoted to drive-in trade makes the property any more "accessible" or attractive to prospective customers and is, therefore, any benefit.

One of Highway's witnesses testified that the widening of the highway and construction of two extra lanes for traffic made the property more "accessible" because it spread the traffic and made it so that people could turn (left) across it more easily. On the other hand, Owners' evidence was to the contrary.

As to curb and gutter. Prior to the taking, the Owners' property was accessible along its entire length on a level with the street. The construction of curb and gutter limited access to driveways. In case of the filling station especially the construction caused a "dip". We fail to see how this improved access to this business property.

■ As to "improved drainage." There was no evidence of any drainage problem at the drive-in. At the filling station property the Owners had what they termed an adequate underground drainage system constructed in accordance with (previous) Highway specifications. The present curb and gutter will carry open water in the dip. We agree with the trial court that Highway did not sustain its burden in proving special benefits.

We do not overlook the fact that another lease of the filling station property was made to an oil company and that some time thereafter a new filling station was erected with a more advantageous rental to the Owners. But this (new construction and lease) involved the investment for removal of the old station, grading down and repavement of the lot, and additional land use. Another factor which must necessarily bear some weight is the tremendous growth of the whole outer area of the City of Springfield (not along Glenstone Avenue alone) during the period involved.

Evidence as to these "special benefits" and increase in value came from Highway's witnesses Dennison and Riebold. These gentlemen had been appraising for Highway for some time with considerable regularity, repletion, and remuneration and were under contract to "support" their appraisals in court. It is quite obvious from the trial court's findings of fact and conclusions of law that he did not regard the conclusions of these witnesses (that the Owners were better off and specially benefited by the circumstances which took five feet across the front and destroyed the practical value of the business buildings on their property) as being either fair or logical. Neither do we.

■ We think the amount awarded was within the range of damages established by the evidence. An appellate court will not ordinarily disturb a judgment for damages

based on conflicting evidence in a condemnation proceeding where the amount awarded is the subject of conflicting evidence and is within the limits of the proof. Public Water Supply District No. 2 of Jackson County v. Alex Bascom Co., Mo., 370 S.W. 2d 281, 290; Union Elec. Co. of Mo. v. Simpson, Mo.App., 371 S.W.2d 673, 683. The judgment is affirmed.

STONE and HOGAN, JJ., concur.