LAND CLEARANCE for REDEVELOPMENT AUTHORITY OF the CITY OF ST. LOUIS, Appellant,

v.

OPAL HENDERSON AND OPAL T. HENDERSON REVOCABLE TRUST, Respondents.

No. ED 95617.

Missouri Court of Appeals, Eastern District, Division One.

Nov. 29, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 10, 2012.

Application for Transfer Denied March 6, 2012.

Lynn S. Brackman, Benjamin J. Siders, St. Louis, MO, for appellant.

C. John Pleban, Lynette M. Petruska, St. Louis, MO, for respondent.

GARY M. GAERTNER, JR., Judge.

### Introduction

Appellant Land Clearance for Redevelopment Authority of the City of St. Louis (LCRA) appeals the jury's award of $1,009,000 to Respondent Opal Henderson, after a trial of exceptions regarding the taking of Ms. Henderson's salvage yard. We affirm.[1]

### Background

Ms. Henderson was the owner and operator of Henderson Salvage Yard, located near the intersection of Interstates 55 and 44 in downtown St. Louis, for 61 years. When the business was established, there were no zoning regulations in place. The current City of St. Louis regulations would require Ms. Henderson to obtain a conditional use permit to operate a salvage yard on her property, but because her business was in operation beforehand, she was "grandfather protected" and was able to continue operating her salvage yard without zoning restrictions, as a legal nonconforming use.

In 2006, LCRA condemned her property and took it in its entirety, in order to put the property to commercial use, including a restaurant/bar and potential retail development.[2] A commissioners' hearing to determine the value of her property took place in 2008, and the commissioners determined just compensation to be $388,500. Henderson filed exceptions to this award, and a jury trial took place in April 2010.

At trial, Ms. Henderson offered expert testimony from Mark Leverenz, a certified public accountant and certified business valuation analyst. Mr. Leverenz used the capitalization of income method to determine the value of Henderson Salvage Yard, from the standpoint of its ability to generate income from that location. After analyzing the financial data of the business and making various adjustments due to the marketability of the business, Mr. Leverenz concluded that the value of Henderson Salvage Yard as of the date of the taking was $1,029,000.

Ms. Henderson also testified at trial, saying she believed her property was worth $2,000,000. She testified that she could not operate her salvage yard business elsewhere in the city, because she would not be able to obtain a conditional use permit. She also testified that relocation would hurt her business.

LRCA offered the testimony of its assistant secretary, Mr. Dale Ruthsatz, who stated that the LCRA had offered Ms. Henderson other properties where she could relocate. He also described the process through which Ms. Henderson could apply for a conditional use permit. He

---

1. Ms. Henderson's motion to strike LCRA's brief is denied. Points I, II, and IV were properly preserved. We reviewed Point III for plain error.

2. Both in a counterclaim to the condemnation petition, and in writs of prohibition filed with this Court and the Missouri Supreme Court, Ms. Henderson disputed whether this taking occurred legitimately, as it was unclear the stated development plan was financially viable. None of those means ultimately prevented the taking of her property. Notably, at the time of trial, Ms. Henderson's property was being used as a parking lot for a bar.

stated that LCRA did not take into account Ms. Henderson's legal nonconforming use of the property when LCRA determined to acquire the property.

LCRA also offered the testimony of an expert real estate appraiser, Mr. Thomas McReynolds. He testified that the highest and best use of the property would be to construct a small commercial building on the premises. Mr. McReynolds compared sales of three lots in the area, and from those he valued Ms. Henderson's property at approximately $230,600. Mr. McReynolds said he assumed in making his valuation that there was no environmental contamination of the property. He also testified that he did not assign value to Ms. Henderson's legal nonconforming use, because he considered the property worth more if used another way.

Mr. Stewart Ryckman, an environmental remediation expert, testified that Ms. Henderson's property did in fact have environmental contamination, which would cost $361,000 to clean up. He also testified he had previously given an estimate of the cleanup cost to LCRA, which at the time was $446,500.

At the close of the evidence, Ms. Henderson offered as rebuttal evidence a statement that the LCRA had taken the position on February 11, 2008, that the value of Ms. Henderson's property was $562,500, and the clean-up costs were $446,500.

The jury awarded Ms. Henderson $1,009,000 as just compensation for the taking of her property, and the court entered judgment for Ms. Henderson in that amount. This appeal followed.

LCRA raises four points on appeal. First, LCRA argues that the trial court improperly allowed the jury to consider the testimony of Ms. Henderson's expert, Mr. Leverenz, because his opinion as to the value of the property was based on the capitalization of income method and he was not qualified to testify as he was a business appraiser. In points II and III, LCRA challenges the constitutionality of Missouri Approved Instruction (MAI) 9.01, revised 2008, as given at trial. Finally, LCRA argues the trial court erred in allowing Ms. Henderson to introduce a document prepared for the commissioners' hearing which contained a prior valuation of the property by LCRA.

*Standard of Review*

■ Regarding Points I and IV, the admission or exclusion of evidence is a matter of the trial court's discretion. *State ex rel. Mo. Highway Transp. Comm'n v. Kuhlmann*, 830 S.W.2d 569, 571 (Mo.App. E.D.1992). We will not reverse the trial court's decisions in this regard absent substantial or glaring injustice. *State ex rel. State Highway Comm'n v. Texaco, Inc.*, 502 S.W.2d 284, 289 (Mo.1973). "An appellate court will not ordinarily disturb a judgment for damages based on conflicting evidence in a condemnation proceeding where the amount awarded is the subject of conflicting evidence and is within the limits of the proof." *State ex rel. State Highway Comm'n v. Ellis*, 382 S.W.2d 225, 236–37 (Mo.App.1964).

As it relates to Points II and III, we review the issue of instructional error de novo. *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 766 (Mo. banc 2010). In order for us to reverse, LCRA must show that the disputed instruction "misdirected, mislead, or confused the jury," and prejudice resulted. *Sorrell v. Norfolk S. Railway Co.*, 249 S.W.3d 207, 209 (Mo. banc 2008).

*Discussion*

*Point I*

LCRA argues that the trial court erred in admitting the testimony of Mr. Lever-

enz for two reasons. First, it argues that Ms. Henderson failed to show her business was inextricably linked to the land taken, thus it was inappropriate to introduce evidence of the value of her land based on capitalization of income from her business. Second, LCRA argues in any event that Mr. Leverenz was not qualified to testify as to the value of Ms. Henderson's property.

### Appropriateness of Capitalization of Income Method

 In condemnation cases, a landowner is entitled to just compensation for the property taken, equal to the fair market value of the property at the time of the taking. *City of St. Louis v. Union Quarry & Constr. Co.*, 394 S.W.2d 300, 305. Historically, "fair market value" has been what a reasonable willing buyer would give and a reasonable willing seller would take, when at the same time neither is compelled to enter the transaction. *Id.* (citing *Union Elec. Co. v. Saale*, 377 S.W.2d 427 (Mo.1964)). Additionally, "[t]he landowner is entitled to the fair market value of the land at its highest and best use." *Id.* (citing *City of St. Louis v. Vasquez*, 341 S.W.2d 839 (Mo.1960)). The various possible uses for the land may be considered in determining fair market value, and if a special adaptation "adds to its value, the owner is entitled to the benefit of it." *Id.* "The value should be fixed ... with reference to the loss the owner sustains, considering the property in its condition and situation at the time it is taken, and not as enhanced by the purpose for which it was taken." *Kan. City Power & Light Co. v. Jenkins*, 648 S.W.2d 555, 560 (Mo.App. W.D.1983) (quoting *United States v. Chan-*

*dler–Dunbar Water Power Co.*, 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063 (1913)).

 The income capitalization approach is one of three methods used in Missouri to value property in complete takings. *State ex rel. State Highway Comm'n v. S. Dev. Co.*, 509 S.W.2d 18, 27 (Mo.1974); *Quincy Soybean Co., Inc. v. Lowe*, 773 S.W.2d 503, 504 (Mo.App. E.D.1989) (method used only in complete takings). It consists of applying a capitalization rate to past income data from a business conducted on the land in order to project a value of the land. *See St. Louis County v. Meyer Props., LLC*, 250 S.W.3d 833, 836 (Mo.App. E.D. 2008); *Del–Mar Redev. Corp. v. Associated Garages, Inc.*, 726 S.W.2d 866, 872 (Mo. App. E.D.1987). Accordingly, this approach produces results that can be speculative in nature, so courts have further limited its use to two unique situations: (1) when the property taken is producing income as rental property, *e.g., Bd. of Pub. Bldgs. v. GMT Corp.*, 580 S.W.2d 519 (Mo. App. E.D.1979); and (2) when the property is being put to a special, income-producing use, *e.g., Union Quarry*, 394 S.W.2d at 306.

In 2006, the Missouri legislature conducted a sweeping reform of eminent domain legislation.[3] One result was a new definition of "fair market value" to be used in condemnation proceedings, which now explicitly includes each of the three accepted valuation methods. This definition is found in Section 523.001 RSMo. (Supp. 2008):

> [T]he value of the property taken after considering comparable sales in the area, capitalization of income, and replacement cost less depreciation, singularly or in combination, as appropriate,

---

**3.** *See generally* Dale A. Whitman, *Eminent Domain Reform in Missouri: A Legislative Memoir*, 71 Mo. L.Rev. 721 (2006) (discussing reform in the wake of the United States Su-

preme Court's decision in *Kelo v. City of New London, Conn.*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005)).

and additionally considering the value of the property based upon its highest and best use, using generally accepted appraisal practices.

The statute contemplates that all three methods will not necessarily be used in every case, but rather states that they *may* be used "singularly, or in combination, as appropriate." Therefore, a party still must show that its valuation method or methods are appropriate for the particular case. As the present case concerns the taking of a salvage yard operated as a legal non-conforming use, we focus our attention on the appropriateness of the capitalization of income method to value special-use properties.

■ First, capitalization of income is appropriate when the special-use business is inextricably linked to the land itself, such that a taking of the property constitutes a taking of the business. *E.g., Union Quarry,* 394 S.W.2d at 306. Such properties as an urban landfill, cemeteries, downtown parking lots, a leased hotel, and a pasture, have all been found to be uses inextricably tied to the land.[4] In the case of the landfill, the Missouri Supreme Court explained that the "profits derived from [the land's] use are the chief source of its value." *Union Quarry,* 394 S.W.2d at 305.

In determining whether a business is inextricably linked to the land, some courts have focused on the source of the income, distinguishing between "whether [it] was produced by the use of the property or by the skill and labors of the landowners." *GMT Corp.,* 580 S.W.2d at 528 (classifying rental of hotel to operator as producing rental income rather than business profits, as latter depended on "capital employed ..., skill and good management of the business"). However, this is simply one factor to take into account.[5] *Cf. Land Clearance Redev. Auth. v. Kan. Univ. & Endowment Ass'n,* 797 S.W.2d 495, 502 (Mo.App. W.D.1990) (concluding *location* of parking lot, rather than use of it or expertise of the owner-operator, caused profitability).

Another important factor indicating an inextricable link between the business and the property is when the business will be destroyed and cannot effectively be relocated. *See Kan. Univ.,* 797 S.W.2d at 502 (parking lot, though can operate elsewhere in downtown area, was made successful by particular location); 4 Nichols on Eminent Domain § 12C.01(3)(d) (3d ed. Rev.2006) (noting scenario in which "business is destroyed by condemnation ... with no possibility of restoring it"; citing recent cases recognizing owners should be compensated for loss).

---

**4.** *Union Quarry,* 394 S.W.2d at 307 (landfill); *State ex rel. State Highway Comm'n v. Mount Moriah,* 434 S.W.2d 470, 472–73 (Mo.1968) (cemetery); *Private Prop. for Mun. Courts Facility v. Kordes,* 431 S.W.2d 124 (Mo.1968) (downtown parking lot); *GMT Corp.,* 580 S.W.2d at 526 (leased hotel); *City of Perryville v. Stark,* 715 S.W.2d 268, 270 (Mo.App. E.D. 1986) (pasture). *Contra St. Louis Hous. Auth. v. Bainter,* 297 S.W.2d 529 (Mo.1957) (no finding of inextricable link between land and gas station, but capitalization of income allowed to show rental value of land); *City of Kan. City v. Manfield,* 926 S.W.2d 51 (Mo. App. W.D.1996) (bar and grill not inextricably linked to land); *State ex rel. Mo. Highway & Transp. Comm'n v. Quiko,* 923 S.W.2d 489

(Mo.App. S.D.1996) (billboards not inextricably linked to land).

**5.** For example, in the taking of a gas station, the Missouri Supreme Court allowed capitalization of income based on gallonage of gasoline sold, without a finding that the gas station was inextricably linked to the land, because it is an accepted practice in the industry for valuing the land upon which a gas station sits. *Bainter,* 297 S.W.2d at 535; *see also State ex rel. Highway Comm'n v. Offutt,* 488 S.W.2d 656, 662 (Mo.1972) (explaining fact of industry practice was essential to *Bainter* opinion).

■ Second, in addition to finding a connection between the business and the land, in order to use the capitalization of income method, the evidence of income must be "clear, certain and easily calculable," in order to minimize conjecture. *Union Quarry*, 394 S.W.2d at 305. *Contra Shelby County R–IV Sch. Dist. v. Herman*, 392 S.W.2d 609 (Mo.1965) (finding farmer's capitalization of profits from best year not stable or representative enough to produce result minimizing conjecture).

Third, a fair market value determination necessitates consideration of the property's highest and best use. § 523.001; *State ex rel. State Highway Comm'n v. Berkeley Sch. Dist.*, 618 S.W.2d 195, 198 (Mo.App. E.D.1981). Accordingly, cases finding that the capitalization of income method is appropriate for special-use properties conclude either that the special use of the property is in fact its highest and best use, or the issue is undisputed.[6] *Cf.* 4 Nichols on Eminent Domain § 12B.08 (3d ed. Rev.2006) (stating when owner relies on income from property to show its value, "he tacitly admits that the use to which the property is devoted is the most advantageous use to which it could be put"). In some cases, the special use is essentially the only use to which the property may be put, *Union Quarry*, 394 S.W.2d at 305 (unique situation in which only use to which property may profitably and advantageously be applied was landfill), but this is not required.

■ In the past, courts have also been more likely to admit capitalization of income evidence when there is a lack of comparable sales evidence. *Mount Moriah*, 434 S.W.2d at 472 (citing *Union Quarry*, 394 S.W.2d 300). However, we also note that consideration of this method should not be precluded simply because other methods are available, or even more appropriate. *State ex rel. Mo. Highway and Transp. Comm'n v. Musterman*, 856 S.W.2d 121, 123 (Mo.App. E.D.1993) (citing *Kan. Univ.*, 797 S.W.2d at 502); *see also* § 523.001. A jury should hear all relevant evidence that would help it determine fair market value, which is within the trial court's discretion. *State ex rel. State Highway Comm'n v. Barron*, 400 S.W.2d 33, 37 (Mo.1966).

The Western District summarized the standard for use of the capitalization of income method in this way: "where there is a complete taking of land improved to its highest and best use and business figures are certain and easily calculable, [evidence of business income] should, in the sound discretion of the trial judge be admitted." *Kan. Univ.*, 797 S.W.2d at 502. Ultimately, each property is unique, and the approach used to value a particular property depends upon the facts and circumstances in the case at hand. *Meyer*, 250 S.W.3d at 836.

■ In the present case, the trial court admitted Mr. Leverenz's testimony of value based on capitalization of income only on the condition that Ms. Henderson would also produce evidence that her business was inextricably linked to the land and would be destroyed by the taking. The condemned land was used as a salvage

---

6. *Union Quarry*, 394 S.W.2d at 306 (court found highest and best use was urban landfill); *Kordes*, 431 S.W.2d at 125 (parties agreed highest and best use was parking lot); *Mount Moriah*, 434 S.W.2d 470 (parties stipulated highest and best use was cemetery); *Bainter*, 297 S.W.2d at 533 (parties agreed highest and best use was gas station); *GMT Corp.*, 580 S.W.2d at 525 (allowing evidence of hotel rental profits "when the renting of the property constitutes its best available use, or at least a plausible use"); *cf. Del–Mar Redev. Corp.*, 726 S.W.2d at 871 ("desireability of the use of the site [as a car wash] would naturally be brought to any buyer's attention in negotiating a sale").

yard at the time of the taking. Ms. Henderson's property had a unique circumstance with her legal nonconforming use of the property. Such use was a vested right. *Odegard Outdoor Advert., LLC v. Bd. of Zoning Adjustment of Jackson County,* 6 S.W.3d 148, 150 (Mo.1999); *St. Charles County v. St. Charles Sign & Elec., Inc.,* 237 S.W.3d 272, 277 (Mo.App. E.D.2007). Her right to this use allowed Ms. Henderson to conduct her business and produce income. There was evidence at trial that none of the salvage yard's surrounding land would have permitted a salvage yard without a conditional use permit, and that relocation was extremely difficult for this and other reasons. There also was evidence that Ms. Henderson's location itself is what attracted business. *Cf. Kan. Univ.,* 797 S.W.2d at 502.

Second, there was no dispute at trial as to the concreteness and accuracy of the evidence of income Mr. Leverenz used to arrive at his opinion. Additionally, the comparable sales evidence offered at trial did not include consideration of properties with a similar legal nonconforming use.

Finally, there was evidence offered that the highest and best use of the property was its current use as a salvage yard. While Mr. McReynolds disputed this, there was also evidence offered that the property was contaminated such that his conclusion as to the highest and best use of the property was called into question.

Given all the particular circumstances in this case and evidence presented concerning the unique aspects of Ms. Henderson's business and her land, it was within the trial court's discretion to allow the jury to consider capitalization of income in arriving at its determination of fair market value for this property.

### Qualification of Mr. Leverenz

■ LCRA's second argument is that even if the capitalization of income method was appropriate in this case, the trial court abused its discretion in admitting Mr. Leverenz's opinion as to value because Mr. Leverenz, a business appraiser, was not qualified to offer an opinion as to the value of real estate. We disagree.

■ The main question in admitting evidence in a condemnation case is whether the evidence assists the jury in resolving the issue of fair market value. *Del–Mar Redev. Corp.,* 726 S.W.2d at 871. The jury may hear all facts that a potential buyer of the land would naturally take into account. *Id.* LCRA does not dispute Mr. Leverenz was qualified to appraise Ms. Henderson's business, but argues that the value of the business was not tied to the value of the property, thus it was improper for the jury to consider the value of the business. *See State ex rel. Mo. Highway & Transp. Comm'n v. Musterman,* 856 S.W.2d 121, 123 (Mo.App. E.D.1993) (holding that "testimony of the separate value of a business, added to the value of the land, is not admissible").

Mr. Leverenz testified that he evaluated the salvage yard from the standpoint of its ability to generate income in its current location. He also stated that he regularly values property from an income standpoint. While he said that he would normally work in conjunction with a real estate appraiser to arrive at a final value of property, he also testified that he uses similar calculations that a real estate appraiser would. Additionally, Mr. Leverenz testified he had consulted with a real estate appraiser on this property, and then he made his conclusion as to the value from his own calculations.

It was within the trial court's discretion to find that Mr. Leverenz's opinion as to the value of the business was sufficiently tied to the value of the land, such that it is

a factor an ordinary potential buyer would consider. He did not offer a value of the business in order to add it to the separate value of the land, *cf. Musterman,* 856 S.W.2d at 123, but rather offered the value of the business as a basis for determining the value of the land because of its unique tie to the land given the circumstances in this case. *See Mount Moriah,* 434 S.W.2d at 473 (stating capitalization of income method is evidence of value, but "not a rigid formula for mathematical determination of the damages"). His opinion, as well as the jury's verdict, were within the limits of proof given other testimony regarding value. Point denied.

### *Point II*

■ LCRA argues that the trial court erroneously gave Missouri Approved Instruction 9.01, Revised 2008, because it amounted to an unconstitutional retroactive application of a substantive change in the definition of "fair market value," found in Section 523.001, RSMo. (Supp.2008). We disagree.[7]

Section 523.001 was approved on July 13, 2006, and it became effective 90 days after the adjournment of the legislature. H.B.1944, 93d Gen. Assem., Reg. Sess. (Mo.2006). LCRA filed its condemnation action on August 11, 2006, after approval of the bill but before it became effective. In response to H.B.1944, in 2008 the Missouri Supreme Court revised MAI 9.01 to incorporate the language of Section

523.001, and ordered that the revised instructions "must be used on and after July 1, 2008." Order Re: Revisions to MAI–Civil (Mo. banc April 15, 2008). In conformity with this order, the trial court in this case gave MAI 9.01 at trial in 2010.[8]

■ Article I, Section 13 of the Missouri Constitution provides "no ex post facto law, nor law ... retrospective in its operation ... can be enacted." Thus, we presume a statute operates prospectively unless one of two scenarios is present: (1) the legislature has clearly expressed an intent that the statute apply retroactively, or (2) the statute is procedural in nature and does not affect substantive rights. *Jones by Williams v. Mo. Dep't of Soc. Servs.,* 966 S.W.2d 324, 327 (Mo.App. E.D. 1998).

In terms of an explicit statement of legislative intent, LCRA argues that Section 523.039 is instructive:

> In all condemnation proceedings filed after December 31, 2006, just compensation for condemned property shall be determined under one of the three following subdivisions, whichever yields the highest compensation, as applicable to the particular type of property and taking: (1) An amount equivalent to the fair market value of such property; . . . .

RSMo. (Supp.2008). As fair market value is defined in Section 523.001, which was enacted simultaneously with Section 523.039, LCRA argues that this definition

---

7. Regarding preservation of this point, LCRA's counsel properly advised the trial court of her objection: "the new MAI 9.01 is unconstitutional in that it incorporates a substantive change to the law and is applying the law retroactively." This was sufficient to notify the trial court of a claimed violation of the Missouri Constitution, Article I, Section 13.

8. The instruction states, "In determining the fair market value of defendant's property, you may consider evidence of the value of the

property including comparable sales, capitalization of income, replacement cost less depreciation, the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances." MAI 9.01 (Rev.2008).

too was not effective in cases filed before December 31, 2006. We disagree.

For ease of reference, we again set forth the text of Section 523.001:

"Fair market value", the value of the property taken after considering comparable sales in the area, capitalization of income, and replacement cost less depreciation, singularly or in combination, as appropriate, and additionally considering the value of the property based upon its highest and best use, using generally accepted appraisal practices.

Because there is no explicit legislative intent in Section 523.001 that indicates whether the statute is retroactive or prospective, we must consider whether the new language defining fair market value embodied a substantive or a procedural change in this law, in order to determine whether the retroactive application of the statute, through use of the 2008 version of MAI 9.01, was appropriate. Substantive changes to the law are those which "take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already passed." *State ex rel. St. Louis–San Francisco Ry. Co. v. Buder,* 515 S.W.2d 409, 410 (Mo. banc 1974).

Fair market value has long been the measure of damages in condemnation cases. *E.g., Metro. St. Ry. Co. v. Walsh,* 197 Mo. 392, 94 S.W. 860, 863 (1906). Additionally, all of the denominated bases for arriving at fair market value in Section 523.001 have for some time been considered to be components used by a jury to arrive at fair market value. *See S. Dev. Co.,* 509 S.W.2d at 27 (recognizing comparable sales, capitalization of income, and replacement cost less depreciation as commonly-used and acceptable methods for determining fair market value); *Union Quarry,* 394 S.W.2d at 305 (stating land-

owner deserves fair market value of land at its highest and best use); *Bi–State Dev. Agency of Mo.–Ill. Metro. Dist. v. Ames Realty Co.,* 258 S.W.3d 99, 108 (Mo.App. E.D.2008) (recognizing across-the-fence methodology as other generally accepted appraisal practice, appropriate for circumstances).

In *State ex rel. State Highway Commission v. Ellis,* the court considered the constitutionality of the retroactive application of Section 523.045, which provided interest to a landowner when the jury's just compensation award was higher than the commissioners' award. 382 S.W.2d 225 (Mo. App.1964). The court found that previous case law had established that a landowner is in fact entitled to interest in these situations, and that the statute was "declaratory only of the then existing substantive law." *Id.* at 230.

The same is true here. As stated above, the substantive law with regard to fair market value in condemnation cases has long entitled landowners to produce evidence of comparable sales, capitalization of income, replacement cost less depreciation, the property's highest and best use, and other evidence based on generally accepted appraisal practices. Section 523.001 codified the existing substantive law, which would have been the law applied in this case whether Section 523.001 existed at the time of filing or not. The enactment of Section 523.001 did not affect substantive rights, thus there is no constitutional infringement in applying it retroactively.

The trial court did not err in giving MAI 9.01 in this case. The instruction did not misdirect, mislead or confuse the jury, inasmuch as it reflected the substantive law as to the definition of fair market value, and the trial court was bound to give it. Mo. R. Civ. P. 70.02(b). Point denied.

*Point III*

■ Next, LCRA argues that MAI 9.01 is unconstitutional as written, in violation of Article V, Section 5 of the Missouri Constitution. We conclude this issue was not preserved at trial, and we find no plain error in the trial court's decision to give this instruction.

In order to preserve a constitutional challenge, a party must raise it at the earliest opportunity, raise it with specificity, and maintain the objection throughout the proceedings. *E.g., City of St. Louis v. Butler,* 358 Mo. 1221, 219 S.W.2d 372, 376 (Mo. banc 1949); *State v. Knifong,* 53 S.W.3d 188, 192–93 (Mo.App. W.D.2001) (applying standard to constitutional challenge of jury instruction). At issue here is whether LCRA raised its constitutional challenge with sufficient specificity.

■ A constitutional challenge must refer to the provision of the Constitution at issue, "such as by explicit reference to the article and section, or by quotation from the particular provision." *Strong v. Am. Cyanamid Co.,* 261 S.W.3d 493, 525 (Mo.App. E.D.2007) (citing *Mo. Highway & Transp. Comm'n v. Merritt,* 204 S.W.3d 278, 284 (Mo.App. E.D.2006)). This is to allow the trial court "an opportunity to fairly identify and rule on the issues." *Merritt,* 204 S.W.3d at 284. A cursory reference to the Constitution that does not discuss the provision or why it has been violated does not fulfill this purpose. *See Strong,* 261 S.W.3d at 525 (argument that statute should be deemed unconstitutional as "it denies ... due process rights, as provided under [both state and federal] Constitutions" not sufficiently specific); *Knifong,* 53 S.W.3d at 193 (objection to

verdict director as "violat[ion of] defendant's due process rights" not sufficiently specific).

At the jury instruction conference, LCRA's counsel objected to the revised version of MAI 9.01 as follows:

> I believe that the new MAI 9.01 is unconstitutional in that it *incorporates a substantive change to the law* and is applying the law retroactively.

(emphasis added). As we found in Point II, this objection was sufficient to preserve LCRA's argument that the instruction was a retroactive application of Section 523.001, which LCRA argued was a substantive change in the law, implicating Missouri Constitution Article I, Section 13. We concluded in Point II, however, that the statute did not make a substantive change and thus no constitutional infringement occurred.

In Point III, LCRA now argues in its brief that its statement at the jury instruction conference that MAI 9.01 "incorporates a substantive change to the law," actually assails the language of MAI 9.01, by claiming that the language of the instruction as written departs from the exact language of Section 523.001 in a way that changes substantive rights and the law relating to evidence.[9] LCRA argues in its brief that this amounts to a violation of Article V, Section 5 of the Missouri Constitution, which states, "rules relating to practice, procedure and pleading for all courts ... shall not change substantive rights, or the law relating to evidence." LCRA claims that because the instruction fails to include the limiting language found in Section 523.001, MAI 9.01 effectively changes the intent of the statute.[10]

---

9. In LCRA's brief, this is actually an alternative argument, pertinent only if we did not find a constitutional violation in Point II.

10. For ease of comparison, we lay out both provisions at issue, emphasizing the differences in language. Section 523.001 defines fair market value as follows:

However, LCRA's trial objection failed to raise this argument, to quote Article V, Section 5 of the Missouri Constitution, or to cite this constitutional provision specifically. We cannot see how the trial court would have known from this one objection it was ruling on two distinct constitutional arguments from two separate constitutional provisions. Thus, we find LCRA's argument in Point III was not preserved for appeal.

We may nevertheless review unpreserved claims of error affecting substantial rights, and we reverse in cases of manifest injustice. Mo. R. Civ. P. 84.13(c); *State ex rel. Mo. Highway & Transp. Comm'n v. Pracht*, 801 S.W.2d 90, 92 (Mo.App. E.D. 1990). Yet, we see no such scenario present here in the minor variance between the language of Section 523.001 and the language of MAI 9.01, in light of the evidence presented. Point denied.

### Point IV

■■■ Finally, LCRA argues that the trial court abused its discretion in admitting evidence prepared for the commissioners' hearing because it lacked foundation and was prejudicial. We disagree.

While we acknowledge the principle that the commissioners' report becomes *functus officio* when the question of damages is tried de novo by a jury, *State ex rel. State Highway Comm'n v. Meadows*, 444 S.W.2d 225, 226 (Mo.App.1969), in limited instances, courts have allowed statements made at the commissioners' hearing to be used for impeachment purposes as long as no reference is made to the commissioners' report. *See State ex rel. Mo. Highway & Transp. Comm'n v. Sisk*, 954 S.W.2d 503 (Mo.App. W.D.1997); *State ex rel. City of Warrensburg v. Stroh*, 690 S.W.2d 215, 217 (Mo.App. W.D.1985). *Cf. Meadows*, 444 S.W.2d at 227 (holding trial court did not err in refusing to admit commissioners' report when witness had admitted making prior inconsistent statement). In these few cases, the evidence has been used to impeach a witness testifying as to the value of the property. In both *Sisk* and *Stroh*, the landowners testified to the value of their land, but in each case they had given lower values at the commissioners' hearings. *Sisk*, 954 S.W.2d at 510; *Stroh*, 690 S.W.2d at 216–17. In *Meadows*, one of the commissioners was testifying and admitted he had previously made an inconsistent statement. 444 S.W.2d at 227.

The statement at issue here is a summary statement of a presentation that LCRA's attorney had prepared for the commissioners' hearing. The presentation listed a property value of $562,500, along with clean-up costs of $446,500. At trial, Ms. Henderson's counsel simply read a statement saying LCRA had previously taken the position that those figures represented the value of Ms. Henderson's property. LCRA argues that because the LCRA did not testify to the value of the

---

[T]he value of the property taken after considering comparable sales in the area, capitalization of income, and replacement cost less depreciation, *singularly or in combination, as appropriate*, and additionally considering the value of the property based upon its highest and best use, *using* generally accepted appraisal practices.

MAI 9.01, revised 2008, instructs the jury in this way:

In determining the fair market value of defendant's property, *you may consider evidence* of the value of the property *including* comparable sales, capitalization of income, replacement cost less depreciation, the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, *and* generally accepted appraisal practices. *You may give such evidence the weight and credibility you believe are appropriate under the circumstances.*

property, there was no opportunity for impeachment and it was not proper to introduce this statement. Additionally, LCRA argues that because the value contained in the statement was not rendered by a qualified expert, the value was inadmissible. The latter was LCRA's sole objection at trial.

The trial court could have found that Ms. Henderson did not offer this statement as an independent value of the property, but rather to undermine LCRA's position through its experts that the value of Ms. Henderson's property was $230,000. If a commissioner and a landowner can be impeached using previous statements made to the commission, so long as any reference to the commissioners' report is removed and the commissioners' award is not disclosed, we cannot see how a condemnor should be able to avoid previous statements made concerning the sole issue at trial, simply because it asserts its opinion as to value through third-party experts. *Cf. Stroh,* 690 S.W.2d at 217. LCRA's counsel argued that the value of the property was $230,000, while at the same time had previously valued the property at more than twice that amount.[11]

The trial court did not abuse its discretion in allowing this statement, which made no reference to the commissioners' report and did not contain the commissioners' findings. The jury's verdict was within the limits of proof. Point denied.

### Conclusion

The trial court did not abuse its discretion in admitting the expert testimony of Mark Leverenz, who was a business appraiser and who valued the property based on capitalization of income. The revised version of MAI 9.01 did not incorporate a substantive change to the law, and therefore was not unconstitutionally applied. LCRA's argument that MAI 9.01 is unconstitutional as written was not preserved for appeal, and the giving of the instruction did not result in plain error. The trial court did not abuse its discretion in admitting the summary statement of LCRA's counsel regarding a previous valuation of Ms. Henderson's property presented at the commissioners' hearing, which made no reference to the commissioners' hearing. We affirm.

CLIFFORD H. AHRENS, P.J., and ROY L. RICHTER, J., concur.

---

11. In fact, if the environmental contamination is taken to decrease value, as stated by LCRA's expert, Mr. McReynolds, then this evidence showed a net value of less than $230,000, which could not result in prejudice to LCRA.